**Hasan BALAZOSKI, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 89–3640.

United States Court of Appeals, Seventh Circuit.

Submitted Feb. 11, 1991.[*]

Decided May 14, 1991.

* The petitioner waived oral argument in this case. The appeal has thus been submitted on the briefs and record. *See* Fed.R.App.P. 34(a); Circuit Rule 34(f).

Elliott L. DuBois, Chicago, Ill., for petitioner.

Anton R. Valukas, U.S. Atty., Chicago, Ill., Alison R. Drucker, Lori L. Scialabba, David J. Kline, Francesco Isgro, Dept. of Justice, Office of Immigration Litigation, Washington, D.C., A.D. Moyer, I.N.S., Chicago, Ill., for respondent.

Before CUMMINGS and FLAUM, Circuit Judges, and GRANT, Senior District Judge.**

FLAUM, Circuit Judge.

Hasan Balazoski seeks review of a decision of the Board of Immigration Appeals (BIA) denying his applications for asylum and withholding of deportation. His asylum request takes us to Yugoslavia, a country long troubled by ethnic tensions that of late have alarmingly escalated.

Balazoski is an ethnic Albanian and a citizen of Yugoslavia. He entered the United States on a visitor's visa in April of 1984. Under the terms of his visa, he was permitted to remain in the United States for six months. October came and went, but Balazoski did not. He remained in the United States after his visa expired but did not contact the INS and explain that he wished to stay. A month later, in November 1984, the INS initiated deportation proceedings against him. At a deportation hearing, Balazoski expressed the fear that if he returned to Yugoslavia, he would be subject to persecution because of his past political activities. At the direction of the Immigration Judge (IJ), Balazoski formally filed an application for asylum under § 208 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1158, and for withholding of deportation under § 243(h) of the INA, 8 U.S.C. § 1253(h).

After a hearing, the IJ denied Balazoski's application. Balazoski then appealed to the BIA and the Board dismissed his appeal. We affirm.

** Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

## I.

■ On appeal to this Court, Balazoski makes two claims. He first contends that the IJ applied the wrong legal standard in evaluating his § 208 asylum claim. Whether the IJ used the incorrect legal standard, however, is irrelevant. We review the decision of the BIA, not the IJ. *See Kubon v. INS*, 913 F.2d 386, 387 (7th Cir.1990); *Rodriguez–Rivera v. United States Dep't of Immigration and Naturalization*, 848 F.2d 998, 1002 (9th Cir.1988). Section 106(a) of the INA, 8 U.S.C. § 1105a(a), confers jurisdiction on this court to review "all final orders of deportation." The final order before us is the BIA's order dismissing Balazoski's appeal from the decision of the IJ. With respect to the standard of review, then, the only question is whether the *BIA* applied the correct law in evaluating Balazoski's appeal. Balazoski does not claim that the Board failed to do so, and for good reason. The Board correctly evaluated his application under the well-founded fear of persecution standard that governs asylum applications. *See* 8 U.S.C. § 1101(a)(42); *INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987); *Kubon*, 913 F.2d at 387; *Matter of Mogharrabi*, Interim Decision 3208 (BIA 1987).

## II.

Balazoski also contends that the BIA erred in finding that he did not have a well-founded fear of persecution. We disagree.

### A.

■ We note first that Balazoski has applied both for asylum and withholding of deportation. Asylum applicants must demonstrate either that they have been the victims of persecution or that they have a "well-founded fear" of persecution. "Well-founded fear" means that a reasonable person in the asylum applicant's circumstances would fear persecution if she were returned to her native country. *See De Valle v. INS*, 901 F.2d 787, 790 (9th Cir.1990) and cases cited therein; *see also Kubon*, 913 F.2d at 388 (petitioner must present "specific facts showing a 'good reason' to fear persecution") (quoting *Carvajal–Munoz v. INS*, 743 F.2d 562, 576 (7th Cir.1984)). Applicants for withholding of deportation, by contrast, must satisfy a higher standard. They must show that there is a "clear probability" that they will face persecution in the country to which they will be deported. *INS v. Stevic*, 467 U.S. 407, 424, 104 S.Ct. 2489, 2498, 81 L.Ed.2d 321 (1984). The Supreme Court has interpreted "clear probability" to mean that it is more likely than not that the deportee would be subject to persecution. *Id.* at 429–30, 104 S.Ct. at 2501.

■ Because the asylum standard is more lenient than the withholding of deportation standard, we will consider as a threshold matter whether the BIA erred in not granting Balazoski asylum; if the BIA did not err in denying Balazoski asylum under the more lenient standard of § 208, then it must follow that it did not err in denying his § 243 claim either. We will uphold the Board's decision that Balazoski did not have a well-founded fear of persecution if it is supported by substantial evidence, *see Kubon*, 913 F.2d at 388, that is, if it appears to be "substantially reasonable." *Rodriguez–Rivera*, 848 F.2d at 1001. Under this standard, we will not reverse the Board because we disagree with its evaluation of the facts, so long as that evaluation is supported by substantial evidence. *Arriaga–Barrientos v. INS*, 925 F.2d 1177, 1179 (9th Cir.1991); *cf. American Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 523, 101 S.Ct. 2478, 2497, 69 L.Ed.2d 185 (1981) ("the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence").

### B.

■ Balazoski's asylum request stems from his involvement in a secret organization known as "Treshi." The organization champions the rights of Albanians living in the Kosovo area of southern Yugoslavia. According to Balazoski's testimony, some of Treshi's members have been imprisoned

in retaliation for their political activities espousing the cause of Albanian nationalism and advocating the secession of Kosovo from Yugoslavia. Balazoski admitted that his own involvement in the organization was limited, and consisted (with one exception we will note below) of attending a number of meetings.

Two particular brushes with Yugoslav authorities animate Balazoski's fear of persecution. The first occurred in 1981 when his niece was shot and his nephew was arrested while participating in a major demonstration staged by Albanians in Yugoslavia. For a period of time after these events, Balazoski was questioned by police about his own political activities and beliefs.

The second source of Balazoski's fears is his participation in a March 1984 demonstration in support of Albanian independence. The demonstration comprised roughly 200 individuals who marched and carried signs for four hours. Balazoski testified that the demonstration was broken up by government authorities throwing smoke bombs. Four demonstrators were arrested at the time, and an unspecified number, according to Balazoski, were arrested afterward.

Balazoski's participation in the demonstration appears to have been limited. He was not involved in organizing the march, nor did he play any other significant role in the day's events. Balazoski explained that he was nevertheless worried because his picture was taken with the four demonstrators who were arrested by authorities.

Balazoski testified that a month before the demonstration, feeling pressured by government authorities, he had already decided to leave Yugoslavia and had applied for and received a visa to visit the United States from the American Embassy in Belgrade. After the demonstration, fearing government retaliation, Balazoski resolved to use the visa he had obtained. Worried that he would be stopped by authorities on his way out of the country, Balazoski directed his cousin to buy him an airline ticket under a false name.

Shortly after Balazoski left Yugoslavia, his family was intensively interrogated regarding his whereabouts. His wife and son, he says, were detained for a number of days, and his house was searched. Balazoski also presented the affidavits of an acquaintance and a relative—both living in the United States—who stated that on visits to Yugoslavia they had been questioned about him by Yugoslav authorities.

Reviewing these facts, the BIA concluded that Balazoski did not have a well-founded fear of persecution. The Board observed that Balazoski was not an organizer of the demonstration in which he participated, nor did he carry a sign or speak in public. The Board noted that those individuals who were arrested at the demonstration were apparently of considerably greater stature than Balazoski in the Treshi organization. Balazoski, in contrast, was an extremely limited participant in antigovernment and pro-Albanian activities and had, until his departure, an unblemished 25–year work history with a government-owned company. "While the present respondent has shown that the authorities may wish to question the respondent upon his return, he has failed to show that they may wish to persecute him," concluded the Board.

We do not question that, as a subjective matter, Balazoski genuinely fears persecution. His exposure to repression in the Yugoslavian political system has no doubt affected him. The question before us, however, is whether the BIA erred in finding that Balazoski's fear of persecution was not objectively reasonable. On this point, we believe substantial evidence supports the Board's conclusion. Balazoski has not presented evidence sufficient to establish that his political activities were of a magnitude or frequency that would cause a reasonable person to fear persecution.

We recognize that our conclusion is to some extent a function of how narrowly or broadly we define "persecution." This is a most elusive and imprecise task, one that is at the margins perhaps uniquely political in nature. Congress did not define persecution in the INA, nor did the United Nations

in the international conventions and protocols that provided the backdrop for congressional asylum legislation and which have thus informed the judiciary's interpretation of § 208. *See, e.g., Cardoza-Fonseca,* 480 U.S. at 436–40, 107 S.Ct. at 1215–17.[1] We know from *INS v. Stevic* that persecution is "seemingly a broader concept than threats to 'life or freedom' ", the phrase used in the withholding of deportation statute. 467 U.S. at 428 n. 22, 104 S.Ct. at 2500 n. 22. Exactly how much broader is unclear. Our research suggests that the courts of appeals have extended the definition of persecution beyond the category of threats to "life or freedom" to cover those cases implicating the well-founded fear of non-lifethreatening violence and physical abuse. *See, e.g., Lazo-Majano v. INS,* 813 F.2d 1432, 1435 (9th Cir.1987); *Desir v. Ilchert,* 840 F.2d 723, 729 (9th Cir.1988). Balazoski's fear does not appear to be of this magnitude. But perhaps the definition should be broader yet. If the relevant definition were as broad as that which might be found in the dictionary—which equates persecution with, among other things, "harassment"—then Balazoski's case would be very close indeed. In our view, however, persecution means more than the harassment to which it appears (when we construe Balazoski's application in a light most favorable to him)

he may be subjected upon his return to Yugoslavia. How much more we need not decide. We leave what falls between Balazoski's case and the more egregious cases cited above for case-by-case determination.

In conclusion, we note that our review of asylum applications is most difficult. Often confronted with what appears to be a genuine fear of persecution, and some not insubstantial (though not overwhelming) amount of evidence which supports that fear—as is the case here—we are asked to determine whether the BIA was correct in determining that a petitioner's worry is not "objectively reasonable." We—judges, not experts in the country in question—have before us what is often a sparse record, containing little more than the testimony of the petitioner. The record is usually devoid of the kind of contextual evidence that would allow us to take an informed stab at the question of the "reasonableness" of an applicants fear of persecution. (Compare the record on appeal in asylum cases with the far more detailed records coming to us from the rulemakings and adjudications of other administrative agencies). Though the BIA sometimes aids us in this regard by taking administrative notice of important facts about the country in question, that is not always the case.[2] Moreover,

---

**1.** The Court in *Cardoza-Fonseca* referenced the United Nations High Commissioner for Refugees' HANDBOOK ON PROCEDURES AND CRITERIA FOR DETERMINING REFUGEE STATUS in its analysis of the asylum provisions of the INA. The section of the Handbook dealing with the definition of persecution illustrates the difficulties inherent in that task:

> There is no universally accepted definition of "persecution", and various attempts to formulate such a definition have met with little success. From Article 33 of the 1951 Convention, it may be inferred that a threat to life or freedom on account of race, religion, nationality, political opinion or membership of a particular social group is always persecution. Other serious violations of human rights—for the same reasons—would also constitute persecution.... Whether other prejudicial actions or threats would amount to persecution will depend on the circumstances of each case....

United Nations High Commissioner for Refugees, HANDBOOK ON PROCEDURES AND CRITERIA FOR DETERMINING REFUGEE STATUS UNDER THE 1951 CON-

VENTION AND THE 1967 PROTOCOL RELATING TO THE STATUS OF REFUGEES ¶¶ 51–52 (1979).

**2.** We note that Immigration Judges are required to consult the Department of State's Bureau of Human Rights and Humanitarian Affairs for its expert opinion in evaluating asylum claims. *See* 8 C.F.R. § 208.10 (1986). Unfortunately, the opinions generated by the Bureau in the past have sometimes constituted no more than one sentence conclusions. In Balazoski's case, for example, the Bureau opined only that "the applicant has failed to establish a well-founded fear of persecution." No reasons were given for this judgment. As much as we might wish to credit the opinion of the Department of State, the usefulness of such advisory opinions is obviously limited. The Bureau has recently recognized this and changed its asylum review policy so as to avoid issuing advisory opinions that place an imprimatur of political approval on asylum decisions in so conclusory a fashion. Now, when the Bureau has nothing of note to say about an asylum application, it simply refers the Immigration Judge to the relevant State

asylum cases move so sluggishly through the administrative and judicial process that by the time they reach us, the relevant political circumstances may have significantly changed. In this case, for example, Balazoski filed his asylum application in 1984. Seven years later, we know that the political situation in Yugoslavia has changed, but as foreign affairs novices, we are not willing to venture a guess as to how these changes have affected the treatment of Albanian separatists.

All this is not meant to suggest that we will not exercise our review function in the asylum process to the best of our ability. The extremely fact-intensive nature of these inquiries and the relatively underdeveloped shape in which they reach us, does, however, suggest why our role in these proceedings is limited, and our review deferential in nature.

AFFIRMED.

Department annual human rights report on the country in question without actually passing judgment on the application. *See* Martin, *Reforming Asylum Adjudications: On Navigating the Coast of Bohemia,* 138 U.Pa.L.Rev. 1247, 1311–12 (1990) (abbreviated version of consultant's report presented to the Administrative Conference of the United States).