Maria Nelly GONZALEZ and Karen
Jordana Gonzalez, Petitioners,

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,**
Respondent.

No. 95–1451.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 30, 1995.

Decided Feb. 29, 1996.

Royal F. Berg (argued), Chicago, IL, for Petitioners.

Janet Reno, Office of the United States Attorney General, Washington, DC, Samuel Der–Yeghiayan, Immigration & Naturalization Service, Chicago, IL, James B. Burns, Office of the United States Attorney, Chicago, IL, William J. Howard, Robert Kendall, Jr., Stephen W. Funk, Ethan B. Kanter (argued), Michael Lindemann, Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for respondent.

Before BAUER, ROVNER, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

Petitioners Maria Gonzalez and her minor daughter, Karen, are natives and citizens of Nicaragua. They fled Nicaragua in March 1989 when the Sandinista-controlled government was in power and subsequently sought asylum in this country. They were denied asylum, and an additional request for withholding of deportation, after a hearing by an immigration judge who found that Maria did not have a well-founded fear that she would be persecuted if she returned to Nicaragua. They appealed to the Board of Immigration Appeals which agreed with the immigration judge and affirmed. They now petition this court for review of the Board's decision. The case requires us to examine whether the petitioners (Karen's case rides on her moth-er's appeal) have a well-founded fear of persecution by either the Contras or the Sandinistas in light of the defeat of the Sandinista party in the Nicaraguan national elections of 1990.

After illegally entering the United States in 1989, the petitioners were arrested in Texas by agents of the Immigration and Naturalization Service and placed under deportation proceedings. They admitted deportability but sought asylum and withholding of deportation under §§ 208 and 243(h) of the Immigration and Nationality Act, 8 U.S.C. §§ 1158, 1253(h), claiming persecution should they return to Nicaragua. Maria Gonzalez's fear of persecution by the Contras was allegedly founded upon her political activities under the Sandinista regime. Her fear of persecution by the Sandinistas was allegedly founded upon her expulsion from the Sandinista party, her public denunciation of a Sandinista party official, and her fleeing and abandoning Nicaragua.

A hearing on the petitioners' requests commenced before Immigration Judge O. John Brahos in August 1989. It was subsequently continued on three separate occasions: October 1989, January 1990, and March 1990. In February 1990, general elections were held in Nicaragua. The overconfident Sandinista party, which had been in power since the 1979 revolution overthrowing Anastasio Somoza Debayle, was soundly defeated by the UNO party (a coalition formed by parties in opposition to the Sandinistas). Violeta Chamorro was installed as the new President of Nicaragua, replacing General Daniel Ortega. At the final deportation hearing in March 1990, the immigration judge took notice of the changed political conditions in Nicaragua where, in addition to Chamorro assuming the office of President, the legislature granted amnesty to both Contras and Sandinistas for their past civil and criminal misdeeds. At the conclusion of the hearing, the immigration judge denied the application for asylum and withholding of deportation. The Gonzalezes were granted voluntary departure from the United States.

Petitioners filed a timely appeal to the BIA. While that appeal was pending, they filed a motion to submit additional evidence

or, in the alternative, for remand to an immigration judge for a hearing to consider new evidence. The BIA denied petitioners' motion for remand and dismissed their appeal on December 30, 1994, but granted them 30 days voluntary departure. In reaching its decision, the BIA found Gonzalez's alleged fear of persecution to be "completely unfounded," lacking substantial support in the record, and significantly undermined by the changed political situation in Nicaragua since 1990. Finally, the BIA denied the motion for remand because the additional supporting materials did not, in its view, remotely suggest that a new hearing would likely change the result in the case.

Petitioners raise several claims on appeal. First, they allege that the BIA erred in denying asylum when it concluded that their fear of persecution was unsupported by objective evidence. Second, they say the BIA erred in denying withholding of deportation because the evidence established that their fear of persecution was more likely than not. Next, they allege their due process rights under the Fifth Amendment were denied by the actions of the immigration judge. Lastly, they contend the BIA erred in failing to remand for a hearing to consider their new evidence.

 To be eligible for asylum, an alien must establish that she meets the statutory definition of "refugee," which requires her to show either past persecution or a "well-founded fear" of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1101(a)(42)(A). If the alien succeeds in this regard, the Attorney General may, in her discretion, grant the applicant's asylum petition. 8 U.S.C. § 1158(a).

Maria Gonzalez does not allege past persecution; rather, she claims a well-founded fear of future persecution based on her political opinions. In her asylum application, Gonzalez stated that in 1975 she received certification as a teacher in elementary and secondary education from a university in Esteli, Nicaragua. She has a child in Nicaragua, as well as the minor child Karen who accompanied her to the United States, and a brother who is a legal resident in the United States. She further stated in her application that she feared arrest and detention for her "counterrevolutionary" activities in Nicaragua and would "only return if I felt that my life and liberties would no longer be in danger." She further indicated that she left Nicaragua to avoid "future imprisonment," and that her departure would be interpreted as an act of disloyalty. In response to a question on the application asking whether she had ever been detained, interrogated, convicted, sentenced, or imprisoned in any country, she answered "no." In response to a question asking whether any member of her family had ever been mistreated by the authorities in her home country on account of race, religion, nationality, political opinion, or membership in a particular social group, she again answered "no."

At the deportation hearings, Maria Gonzalez testified she became active in the Sandinista Front in 1976 as a mail woman or courier prior to the 1979 Sandinista revolution. She distributed propaganda in Managua as well as traveled to Mexico several times to visit Nicaraguans in "exile" and deliver mail to them. Upon return to Nicaragua on one such occasion, she was questioned by Nicaraguan immigration authorities for five hours, although she failed to mention this incident on her asylum application. Following the revolution, she continued her activity with the Sandinistas and in 1980 was sent to the town of Muymuy to be a "vice coordinator" in the "National Crusade for Alphabetization," a literacy campaign. She supervised the literacy campaign's activities in sixteen towns. She also worked with the "defense committee of the Sandinistas," or CDS, and helped recruit "peasants" for the "popular militia." She believed the Contras were aware of her activities in Muymuy because other people told her that her name was broadcast on a Contra-controlled radio station. She stated the Contras were active in the Muymuy region, although that region is centrally located and far from the Honduran border where Contra activity was highest. However, while in Muymuy she never personally encountered any Contras.

In 1983 she was transferred from Muymuy to Matiguas where she continued her work in the literacy campaign. She claimed there was also Contra activity around Matiguas and claimed that some people working in the literacy campaign were kidnapped or harmed by Contras. Fearing such retribution, she requested a transfer. In 1984 she was transferred from Matiguas to Matagalpa where she served as a "regional technician" in the "war zones," reporting to her superiors on problems with education and with names of Contra collaborators.

In February 1985 she moved to Managua to work at the "Nicaraguan Institute of Energy" (INE). She was actively involved in the INE's labor union and elected to the position of general secretary of a unit of the union which represented workers in the training department. While working at INE she requested a meeting with a man named Rapaccioli, the government minister who supervised the INE. At this meeting she accused one of her supervisors, Ms. Jimenez, an assistant to Minister Rapaccioli, of abusing her position by using state-owned vehicles for her personal business. Minister Rapaccioli said he would investigate the matter. Dissatisfied with the delay in his investigation, Gonzalez took matters into her own hands and reported her allegations to the press. This angered Minister Rappacioli (again, this is all from Gonzalez's testimony), but he took no action against her. At or about this time, the training department at the INE was targeted for a "compaction" or work-force reduction. Gonzalez opposed the reduction and, in protest, added her name to the list of workers being dismissed. As a consequence of this action and her previous public denunciation of Jimenez, Gonzalez claims she was expelled as a member of the Sandinista Front by Minister Rapaccioli.

Thereafter, Gonzalez was not employed, but instead received support from family and friends. She began thinking of leaving Nicaragua in 1987, but waited until 1989 when she had saved enough money. She applied for a passport and exit visa from the Sandinista government, which she had no trouble obtaining. In her application, she did not disclose that she was a teacher. She feared not being permitted to leave Nicaragua since the government was restricting the exit of professionals. She was also afraid that an investigation might disclose the incidents at INE, that her attempt to leave might be viewed as counter-revolutionary, and that she would be detained. In February 1989 she left Nicaragua without being investigated or detained.

Her brother also testified before the immigration judge. He stated that Maria was formerly a general secretary for the INE union, that she was a militant in the Sandinista Front, and that she left the INE in 1988 as a consequence of her denunciation of Jimenez and her opposition to the work-force reduction. In addition to her brother's testimony and her own, petitioner submitted to the immigration judge a series of newspaper articles reporting on Sandinista activities and Contra guerrilla attacks. These articles predated the national elections and general amnesty between the Contras and Sandinistas in 1990 and did not address the then current conditions in Nicaragua in late 1989 and early 1990.

At the final hearing in March 1990, Judge Brahos took administrative notice of the recently changed political conditions in Nicaragua. He stated,

> many things have changed since you last appeared before the Court. We've had an election in Nicaragua.... President Ortega was voted out of office and we have the legislature in Nicaragua granting amnesty to the Contras and to the Sandinistas for all their misdeeds and apparently things have changed.

The judge asked Gonzalez whether in light of these changed conditions she still feared for her life and safety if she were to return to Nicaragua. She replied that the fear she felt was greater. Based on her former affiliation with the Sandinistas she risked disappearing, she claimed, due to the fact that the Contras would be coming to power with the new President, Chamorro. She also stated again that she feared the Sandinistas because she had abandoned the country.

At the conclusion of the hearing, the immigration judge issued a decision denying petitioners' application for asylum and withholding of deportation. The judge found the

testimony presented by petitioner and her brother to be "evasive," "vague," and lacking in "forthrightness." He found petitioner's allegations lacked corroboration which undermined her attempt to establish an objective basis for her alleged fear of returning to Nicaragua. He further found "no showing" regarding her fear that the Contras would take control of the Nicaraguan government, and he determined that her other fears of returning to Nicaragua were unreasonable in light of the changed political conditions there. Finally, acknowledging that a grant of voluntary departure would be "inconsistent" with his negative assessment of petitioner's credibility, the judge nevertheless decided to grant such relief in the exercise of his discretion.

The BIA rejected petitioner's appeal, explaining why her alleged fear of persecution from the Contras was "completely unsupported by objective fact," and why her alleged fear of persecution from the Sandinistas lacked "substantial support in the record." The BIA also found her allegations of fear were significantly undermined by the change of political conditions which occurred in 1990. Despite ample opportunity to respond to this information, the BIA found that petitioner had "not shown any evidence that anyone in circumstances substantially similar to her own has ever been persecuted by the Sandinistas or Contras" after the 1990 government change. Gonzalez did submit additional materials to the BIA, but only in support of her motion for remand. These documents included general reports and articles addressing Nicaraguan political conditions and human rights since the February 1990 elections. However, none of these materials related in any way to her particular fear of persecution by both the Contras and Sandinistas should she return, or to fear of persecution by similarly situated individuals.

■ We review a BIA decision denying applications for asylum and withholding of deportation under the "substantial evidence" test. *Milosevic v. INS*, 18 F.3d 366, 370 (7th Cir.1994). Under this "highly deferential standard of review," we rely solely on the administrative record upon which the deportation order is based. 8 U.S.C. § 1105a(a)(4). We must uphold the Board's determination "if it is supported by reasonable, substantial, and probative evidence on the record as a whole, 8 U.S.C. § 1105a(a)(4), and may reverse only if the evidence is so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Milosevic*, 18 F.3d at 370 (citations omitted). "[A] reviewing court is not entitled to reverse 'simply because it is convinced that it would have decided the case differently.'" *Anton v. INS*, 50 F.3d 469, 472 (7th Cir.1995) (citation omitted).

■ An applicant seeking asylum must show either that she has been a victim of persecution or that she has a well-founded fear of persecution. *Balazoski v. INS*, 932 F.2d 638, 640 (7th Cir.1991). In order to demonstrate a well-founded fear, a petitioner must present specific, detailed facts supporting the reasonableness of fear that he or she will be singled out for persecution. *Milosevic*, 18 F.3d at 370. Although there is no statutory definition of "persecution," our cases have described it as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *DeSouza v. INS*, 999 F.2d 1156, 1158 (7th Cir.1993). "[C]onditions of political upheaval which affect the populace as a whole or in large part are generally insufficient to establish eligibility for asylum." *Sivaainkaran v. INS*, 972 F.2d 161, 165 (7th Cir.1992).

■ In the present case, the record is devoid of facts which would support a finding that petitioner has a well-founded fear of persecution. Petitioner stated that she was questioned by government officials upon her return to Nicaragua following a trip to Mexico. Apart from this isolated incident, petitioner presented no evidence that she had ever been detained, arrested, interrogated, prosecuted, imprisoned, or subject to illegal searches, confiscation of property, surveillance, beatings, or torture by the Contras or Sandinistas. Nor has she presented any evidence that anyone in circumstances like her own had ever been subject to persecution at the hands of the Contras or Sandinistas since the change in government in 1990. In short,

she has failed to establish that she suffered "punishment or the infliction of harm for political, religious, or other reasons that are offensive." *Milosevic*, 18 F.3d at 370 (citations omitted).

■ Turning to the record, Maria Gonzalez rests her claim of asylum on her fear of persecution from both the Contras and the Sandinistas. She argues that the fear is more than alleged; it is real. An applicant for asylum must demonstrate "only a subjective fear of persecution should she return to her homeland and the objective reasonableness of that fear." *Sanon v. INS*, 52 F.3d 648, 651 (7th Cir.1995). Here, the Board found her fear of the Contras to be unfounded for several reasons: (1) the Contra war ended with the general amnesty in 1990; (2) she left the region where the Contra broadcasts were allegedly heard and was never bothered by the Contras again; (3) the alleged broadcasts occurred more than ten years ago, and despite the fact that she acquired increasingly more responsibility in the Sandinista party, in her union, and in government service, she was never bothered by the Contras; and (4) the former Contras have not taken over the Nicaraguan military as she has feared.

■ Substantial evidence supports the BIA's determination that petitioner's fears are not objectively reasonable. Her fear of the Contras was not reasonable given that the radio broadcasts occurred more than ten years ago, and she subsequently moved away from the Contra strongholds in that region. She was never bothered by the Contras when she lived in the Muymuy region nor was she bothered at anytime prior to her leaving the country. Her alleged fear that the Contras would become the army of the new government in Nicaragua is also unfounded. She offered no objective evidence that the Contras had come to power since the new elections in 1990. In fact, the materials submitted in support of her motion for remand suggested that the Sandinistas retained control over the military notwithstanding their loss in the general elections. Moreover, even if the Contras have come to exercise some control over the military, she failed to offer objective evidence that she, or someone in similar circumstances, would be singled out for persecution.

■ Turning to her subjective fear of persecution from the Sandinistas, we find the Board's determination that her fear lacked a substantial supporting basis in the record to also be supported by reasonable and substantial evidence. She contends her fear is objectively reasonable because: (1) the Sandinistas expelled her as a member of the Front; (2) her departure from Nicaragua will be viewed as an "act of disloyalty in the eyes of the Sandinistas;" and (3) the Sandinistas' post–1990 election control of the military "heightens her fear of persecution."

Gonzalez attributed her expulsion to Minister Rapaccioli's anger at her public disclosure of his assistant's misconduct before he was able to investigate, and her voluntary decision to join the list of workers dismissed from the INE. She also stated that she could have remained a member of the Front had she not joined the list of workers who were dismissed. She remained in Nicaragua for over nine months following her expulsion without any threatened or actual mistreatment or persecution by the Sandinistas. This evidence, which is both substantial and reasonable, supports the Board's conclusion that her expulsion from the party was simply punishment for her actions while at INE. It was not objective evidence of her fear of future persecution by the Sandinistas.

Her further testimony undermines the objective reasonableness of her fear. She stated that upon her expulsion she refused to give up her identification card. This apparently defiant attitude is plainly inconsistent with her allegations of fear. She was not interrogated, detained, punished, or otherwise mistreated for failing to return her card. In fact, when she applied to the Sandinista government for a passport and exit visa to leave Nicaragua, she received them freely without interrogation or detention. In addition, she stated that she wanted to leave Nicaragua as early as 1987; however, she did not leave until 1989. This demonstrates that her desire to leave the country was not solely the result of her actions while employed by the INE and her subsequent expulsion from

the party. Rather, as she testified, her desire to leave was fueled by her disenchantment with some of the tasks assigned to her as a loyal member of the Sandinista party.

■■■ Petitioner's claim that her departure from Nicaragua would be viewed as an act of disloyalty is also unsupported by the record. She offered no evidence that anyone in substantially similar circumstances had ever been persecuted for leaving the country. Moreover, after the election brought government change in 1990, the Nicaraguan legislature offered amnesty for all Contras and Sandinistas for misdeeds, and petitioner failed to show that upon her return she would be singled out for persecution by virtue of leaving the country.

■■■ Finally, petitioner asserts that the Sandinistas still maintain control over the military; thus, she fears persecution upon her return. In support of her claim, she only offers a report that after the 1990 elections the Sandinistas still control the military. As we have noted several times, the BIA took notice of the changed political conditions in Nicaragua. Even accepting the accuracy of the submitted reports regarding Sandinista control of the military, petitioner has completely failed to offer any objective evidence that she, as someone who was expelled from the Sandinista Front and subsequently left the country, has been or will be singled out for persecution by the Sandinistas upon return to Nicaragua at this time. Nor does petitioner offer any objective evidence that anyone in circumstances much like her own has been or will be singled out for persecution.

In sum, a reasonable factfinder in this case would not be compelled to find that the petitioner has a realistic fear of persecution by either the Contras or the Sandinistas. The Board's conclusion that petitioner's fear of persecution was without objective support is substantially supported by the record.

■■■ The Board's refusal to withhold deportation was also appropriate. The standard for withholding of deportation is even more stringent than the standard for granting asylum. Applicants must show that there is a "clear probability that they will face persecution in the country to which they will be deported." *Balazoski v. INS*, 932 F.2d 638, 640 (7th Cir.1991) (citation omitted). We have held that Gonzalez failed to prove, with objective evidence, a "well-founded fear" of persecution to entitle her to asylum. The same evidence is, therefore, necessarily inadequate to establish the higher "clear probability" of persecution standard necessary for withholding of deportation. *Id.* The law is well-settled and we need not conduct a separate analysis. *Urukov v. INS*, 55 F.3d 222, 230 (7th Cir.1995); *Bevc v. INS*, 47 F.3d 907, 910–11 (7th Cir.1995).

■■■ Petitioner raises three more claims which are easily resolved. First, she argues that her due process rights were violated because Judge Brahos was not impartial. She alleges that his negative assessment of her credibility reveals his prejudgment of the case. This claim is meritless. The petition for review before this court challenges the BIA's decision, not the decision of the immigration judge. In this case the BIA did not adopt the immigration judge's reasoning regarding petitioner's credibility. Instead, the BIA conducted an independent review of the record. Had the BIA explicitly relied upon the immigration judge's reasoning, then petitioner could directly challenge that reasoning in her appeal. *Cuevas v. INS*, 43 F.3d 1167, 1170 (7th Cir.1995). Since the BIA did not adopt any of the immigration judge's reasoning in this case, her challenge to his assessment of her credibility is irrelevant to our review of the BIA decision and barred on appeal. *Cf. Balazoski*, 932 F.2d at 640 (issue of legal standard employed by immigration judge is irrelevant; the court reviews the decision of the BIA, not the immigration judge). Furthermore, judges must often comment on credibility, and we cannot, of course, presume a lack of impartiality merely because an assessment is unfavorable.

Second, petitioner claims the Board erred when it denied her motion for remand. She claims the Board failed to give proper consideration to the materials she submitted in support of her motion for remand. This

argument lacks any objective evidence and is simply speculative. After completely reviewing those materials, the Board found that they did not "remotely suggest that a new hearing would likely change the result in this case." Petitioner has failed to explain now how further consideration of the materials would have changed the outcome. In her motion for remand she argued that the materials submitted stand for the proposition that the "Sandinista Front continues to wield substantial power in Nicaragua" with its continuing control over the military and state security apparatus. She raised this argument before the immigration judge and the BIA, and both took administrative notice of the changed political conditions in Nicaragua. However, the petitioner failed to indicate before the immigration judge, the BIA, and here, any instance in which an individual in circumstances similar to hers has been persecuted upon return to Nicaragua following the 1990 elections.

■ Furthermore, contrary to petitioner's assertion, the Board found that the "Sandinistas, while remaining influential, no longer exert exclusive control over the Nicaraguan government." This demonstrates that the Board did consider the issue of continued Sandinista influence and power addressed by petitioners' supporting materials, but ultimately found against petitioners on that issue. Thus, we find the Board's conclusion that the materials do not remotely suggest that the immigration judge would have ruled differently to be supported by substantial and reasonable evidence in the record and well within its broad discretion.

■ Third, petitioner claims she was denied due process by not being afforded an opportunity to respond to the administrative notice of the change in political conditions in Nicaragua that was taken by the Board. This argument is also meritless. Administrative agencies may take official notice of commonly acknowledged facts, and parties must have the opportunity to rebut such notice. *Kaczmarczyk v. INS*, 933 F.2d 588, 593, 596 (7th Cir.), *cert. denied*, 502 U.S. 981, 112 S.Ct. 583, 116 L.Ed.2d 608 (1991). In *Kaczmarczyk*, this court made clear that due process does not require the Board to give an

asylum applicant the opportunity to rebut noticed facts prior to reaching a decision. Rather, we found that the mechanism of the motion to reopen, which "allows asylum petitioners an opportunity to introduce evidence rebutting officially noticed facts," provides a sufficient opportunity to be heard to satisfy the requirements of due process. *Id.* at 597; *Rhoa–Zamora v. INS*, 971 F.2d 26, 34 (7th Cir.1992). *Accord Gutierrez–Rogue v. INS*, 954 F.2d 769, 773 (D.C.Cir.1992); *Rivera–Cruz v. INS*, 948 F.2d 962, 968–69 (5th Cir. 1991), *rehearing denied*, 954 F.2d 723 (1992). *But see Castellon–Villagra v. INS*, 972 F.2d 1017 (9th Cir.1992); *de la Llana–Castello v. INS*, 16 F.3d 1093, 1099–1100 (10th Cir.1994).

■ In this case, after the BIA dismissed the appeal, petitioners did not file a motion to reopen with the BIA to introduce evidence rebutting officially noticed facts regarding the change in government. Nor did they request from the BIA any other opportunity to respond to the noticed facts. Their inaction in this regard suggests that petitioners had already been provided a meaningful opportunity to be heard on the issue regarding the change in government. Indeed, administrative notice of the changed political conditions in Nicaragua was first taken by the immigration judge at the hearing in March 1990. Gonzalez responded to this notice when she testified that her fear was now even "greater." On appeal to the BIA, she argued in response to the "weight" placed by the immigration judge on the outcome of the 1990 elections. Furthermore, while the appeal was pending with the BIA, petitioners filed a motion to consider additional evidence or for remand to consider the evidence. They submitted materials in support of their motion which were published subsequent to the March 1990 elections, and which they claimed demonstrated that the Sandinistas continued to wield substantial power in Nicaragua. Their actions demonstrate that petitioners were afforded a meaningful opportunity to respond to the changed political conditions in Nicaragua. Moreover, they repeatedly exercised that right at the hearing before the immigration judge, on appeal to the Board, and in their motion for consideration of additional evi-

dence or for remand. The Board did not deprive Gonzalez of her right to due process.

For the foregoing reasons, the decision of the Board to deny the petitioners' application for asylum and withholding of deportation is AFFIRMED.