USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1484

 REYNALDO AGUILAR-SOLIS,

 Petitioner,

 v.

 IMMIGRATION AND NATURALIZATION SERVICE,

 Respondent.

 PETITION FOR REVIEW OF AN ORDER
 OF THE BOARD OF IMMIGRATION APPEALS

 Before

 Selya, Circuit Judge,
 
 Gibson,* Senior Circuit Judge,
 
 and Lipez, Circuit Judge.
 
 

 Vincent J. Cammarano for petitioner.
 Elizabeth A. Welsh, Senior Litigation Counsel, Office of
Immigration Litigation, United States Department of Justice, with
whom Frank W. Hunger, Assistant Attorney General, Civil Division,
and Mark C. Walters, Assistant Director, Office of Immigration
Litigation, were on brief, for respondent.

February 26, 1999

 
_____________
*Hon. John R. Gibson, of the Eighth Circuit, sitting by
designation. SELYA, Circuit Judge. Reynaldo Aguilar-Solis (Aguilar),
an El Salvadoran national, solicits judicial review of a final
order of the Board of Immigration Appeals (BIA) denying his
application for asylum and withholding of deportation. He claims
that the hearing officer's heavy-handedness abridged his right to
due process, that the BIA's rejection of his application lacked
record support, and that Congress's enactment of the Nicaraguan
Adjustment and Central American Relief Act of 1997 (NACARA), Pub.
L. No. 105-100, 111 Stat. 2193 (Nov. 19, 1997), as amended by Act
of Dec. 2, 1997, Pub. L. No. 105-139, 111 Stat. 2644, calls into
constitutional question the BIA's disposition of his case. Finding
these arguments unpersuasive, we uphold the BIA's order.
I. BACKGROUND
 The petitioner claims that he fled to the United States
from his native land in 1985 to avoid persecution on account of his
(and his family's) political views. Instead of seeking political
asylum immediately after his illegal entry, the petitioner
knowingly purchased a bogus social security card and parlayed it
into a driver's license and, ultimately, employment. At some
point, he met a woman (also an illegal alien from El Salvador) and
returned home with her in December 1990 to be married. Prior to
departing, the petitioner paid $3,000 to buy a fake temporary
resident alien card, notwithstanding his present insistence that
the couple intended to reside permanently in El Salvador.
 During the petitioner's nuptial stay, friends and family
allegedly informed him that members of a guerilla organization, the
FMLN, were making inquiries. He testified that these warnings
precipitated his abrupt return to the United States. Immigration
officials apprehended him at the Miami International Airport in
February 1991 as he attempted to enter the United States by using
the fraudulent card. Instead of seeking asylum, he elected to
withdraw his application for entry. He thereupon returned to El
Salvador and, the following month, made a surreptitious border
crossing near San Diego, California. He then paid to have his
bride smuggled into the country.
 Some four years later, the Immigration and Naturalization
Service (INS) apprehended the petitioner and began proceedings to
deport him on the ground that he had entered the United States
illegally. See 8 U.S.C. 1251(a)(1)(B). The petitioner conceded
deportability, but requested political asylum and withholding of
deportation or, in the alternative, voluntary departure. At the
conclusion of the hearing, the Immigration Judge (IJ) issued an
adverse bench decision. The petitioner sought review, arguing that
the IJ's conduct at the hearing violated his right to due process
and that the evidence mandated a grant of asylum. In a per curiam
opinion, the BIA rejected both contentions.
II. ANALYSIS
 We address in sequence the petitioner's claims that the
BIA erred (i) in its condonation of the IJ's conduct, and (ii) in
its denial of his asylum claim. We then turn to the petitioner's
blunderbuss constitutional challenge (raised for the first time in
this venue).
 A. Fairness of the Hearing.
 The petitioner argues that the IJ's handling of his case
compromised the fundamental fairness of the hearing. Specifically,
he asserts that the IJ cross-examined him, interrupted his
testimony, and suggested lines of inquiry to the INS's attorney. 
This course of conduct, he says, prevented him from building a
consistent, detailed evidentiary record and reflected an
impermissible bias. We review the question of whether an
administrative law judge's conduct violates a party's due process
rights de novo. See Ivezaj v. INS, 84 F.3d 215, 220 (6th Cir.
1996); Hartooni v. INS, 21 F.3d 336, 339 (9th Cir. 1994).
 We have carefully examined the hearing transcript and
find no constitutional infirmity. An immigration judge, like other
judicial officers, possesses broad (though not uncabined)
discretion over the conduct of trial proceedings. See Iliev v.
INS, 127 F.3d 638, 643 (7th Cir. 1997); cf. Logue v. Dore, 103 F.3d
1040, 1045 (1st Cir. 1997) (discussing discretion possessed by
federal district judge). During the three-day hearing in this
case, the IJ appears to have used that discretion suitably and to
have provided the petitioner with every opportunity to make his
case.
 To be sure, the IJ attempted to move things along by
preventing repetitive testimony and encouraging the parties to
stipulate to undisputed facts. In doing so, however, she imposed
no unreasonable restrictions on the petitioner's presentation of
either testimonial or documentary proof. Moreover, she afforded
each witness (the petitioner included) the opportunity to testify
fully and facilitated the petitioner's efforts to reconcile
conflicting answers that he had given in three separate asylum
applications.
 The petitioner's complaints that the IJ interrupted his
testimony and cross-examined him do not withstand scrutiny. The
record reveals that the IJ interrupted only to clarify responses or
to return strayed questioning to a relevant line of inquiry. A
judge who plays an active, but even-handed, role in keeping the
focus of the inquiry sharp is to be commended, not condemned. SeeLogue, 103 F.3d at 1045. By like token, the IJ's cross-examination
was wholly consistent with the requirements of the Immigration and
Nationality Act (the Act). See 8 U.S.C. 1252(b) ("The
immigration judge shall . . . receive evidence, interrogate,
examine, and cross-examine the alien or witnesses.").
 We do not mean to suggest that the Act relieves
immigration judges of their responsibility to function as neutral
and impartial arbiters. Notwithstanding the statutory directive,
immigration judges must assiduously refrain from becoming advocates
for either party. Here, however, the IJ's neutrality cannot
seriously be doubted. Even if viewed through a jaundiced eye, the
transcript reflects nothing more sinister than a modicum of
impatience. This is not the stuff from which a due process
violation can be fashioned. See Liteky v. United States, 510 U.S.
540, 555-56 (1994) (holding that charges of judicial bias and
partiality cannot be established solely by "expressions of
impatience, dissatisfaction, annoyance, and even anger"); Logue,
103 F.3d at 1045 (similar).
 To say more would be supererogatory. The short of it is
that the IJ conducted the proceedings in this case in a balanced,
thoroughly professional manner. No more is exigible: a party to
an immigration case, like any other litigant, is entitled to a full
and fair hearing not an idyllic one.

 B. Asylum.
 Before us, the petitioner does not press for voluntary
departure, but, rather, seeks political asylum and withholding of
deportation. We need discuss only the asylum claim.
 As a prerequisite to asylum eligibility, an alien bears
the burden of establishing that he is a refugee. See 8 U.S.C. 
1158(b)(1); 8 C.F.R. 208.13(a). The Act defines "refugee" as a
person who cannot or will not return to his country of nationality
or avail himself of that country's protection "because of
persecution or a well-founded fear of persecution on account of
race, religion, nationality, membership in a particular social
group, or political opinion." 8 U.S.C. 1101(42)(A). The IJ
concluded that the petitioner failed to establish either past
persecution or a well-founded fear of future persecution on account
of one of the five enumerated grounds, and the BIA concurred.
 The BIA's decision must be upheld if "supported by
reasonable, substantial, and probative evidence on the record
considered as a whole." 8 U.S.C. 1105a(a)(4). The Supreme Court
has interpreted this deferential standard to permit reversal of a
BIA decision on sufficiency grounds only when the record evidence
would compel a reasonable factfinder to make a contrary
determination. See INS v. Elias-Zacarias, 502 U.S. 478, 481 & n.1
(1992). For purposes of this case, the Elias-Zacarias standard
signifies that, if the petitioner is to prevail, the administrative
record, viewed in its entirety, must compel the conclusion that he
is asylum-eligible. We conclude that the evidence falls far short
of this target.
 1. Past Persecution. Congress has not defined the term
"persecution" and the courts thus far have failed to achieve a
general consensus on its meaning and scope in this context. 
Generalities abound. We know, for example, that persecution
encompasses more than threats to life or freedom, see INS v.
Stevic, 467 U.S. 407, 428 n.22 (1984), but less than mere
harassment or annoyance, see Balazoski v. INS, 932 F.2d 638, 642
(7th Cir. 1991). Between these broad margins, courts have tended
to consider the subject on an ad hoc basis. See, e.g., Marquez v.
INS, 105 F.3d 374, 379 (7th Cir. 1997).
 This case does not require that we etch a more precise
configuration. Even if we assume, for argument's sake, that the
acts alleged here could fall into the elusive realm of
"persecution," the record supports the IJ's multi-pronged finding
that the petitioner's credibility was impaired and that his
evidence, to the extent credible at all, lacked the specificity
required to establish the requisite nexus between the alleged acts
and one of the five statutorily protected grounds.
 We turn first to the proof. In support of his claim of
past persecution, the petitioner testified to the following. His
family owned a plantation in Chalatenango. During the civil war
that rocked El Salvador from 1979 to 1992, the region became a
stronghold for the FMLN a left-wing insurgent group that aspired
to topple the national government. Until his death in 1982, the
petitioner's father managed the family farm and also dabbled in
local politics. His membership in a series of political parties
(most notably, the ARENA party) placed him on the opposite end of
the political spectrum from the FMLN. There is no evidence,
however, that the petitioner (or any family member other than his
father) was more than marginally involved in political activities
or held office in any political organization.
 Despite this lack of personal involvement, the petitioner
contends that the FMLN targeted him and his family, even after his
father's death, for special attention. According to his account,
the first sign of harassment occurred in 1980 when FMLN guerrillas
took him, his older brother, and several others into the woods and
attempted to recruit them. The petitioner responded neutrally to
the recruitment effort, stating only that he would think about it. 
No one was threatened or physically harmed. During the early
1980s, the petitioner's family received numerous threats (from
unspecified sources), but these also came to naught.
 In 1982, the government encouraged formation of local
groups, which came to be called the Civil Defense Patrol (CDP), to
defend against the guerrillas. The local branch of the CDP
comprised 15 to 20 members. The petitioner's older brother
commanded the unit and the petitioner served in it. According to
the petitioner, the CDP engaged the guerrillas in several armed
confrontations between 1982 and 1984 (at which time the guerrillas
seized firm control of the region and the CDP disbanded).
 Concerned about their safety, the petitioner's family
temporarily moved to the capital, San Salvador. Thereafter, they
lived in both regions, shuttling back and forth from San Salvador
to Chalatenango. During this nomadic period, the family home in
Chalatenango was destroyed, although the record contains no clear
indication as to when, how, why, or by whom. Finally, in 1985,
FMLN guerrillas ambushed a truck which the petitioner's older
brother was driving from San Salvador to Chalatenango, and killed
him. At that point, the petitioner fled the country.
 The petitioner maintains that this evidence, virtually
all of which comes from his own mouth, demanded a finding of past
persecution. We do not agree. We recognize, of course, that
"[t]he testimony of the applicant, if credible, may be sufficient
to sustain the burden of proof without corroboration." 8 C.F.R. 
208.13(a). This does not mean that a reviewing court must take
every applicant's uncontradicted testimony at face value, for
testimony sometimes is internally inconsistent or belied by the
prevailing circumstances. Furthermore, a witness's demeanor is
often a critical factor in determining his veracity. See Cordero-
Trejo v. INS, 40 F.3d 482, 491 (1st Cir. 1994). And when a hearing
officer who saw and heard a witness makes an adverse credibility
determination and supports it with specific findings, an appellate
court ordinarily should accord it significant respect. See Nasirv. INS, 122 F.3d 484, 486 (7th Cir. 1997); NLRB v. Horizons Hotel
Corp., 49 F.3d 795, 799 (1st Cir. 1995). While the obligation to
defer should not be confused with an obligation to rubber-stamp the
hearing officer's credibility call, such a determination merits
judicial approbation as long as the findings on which it rests have
sufficiently sturdy roots in the administrative record.
 This is such a case. In making her credibility judgment,
the IJ emphasized the petitioner's acquisition of an ersatz
temporary resident alien card in 1990 and the improbability of his
claim that he did not know the card was bogus. She also pointed
out that the circumstances surrounding the purchase belied the
petitioner's story: he obtained the card through a Brazilian
intermediary whose last name he professed not to recall, never
stepped foot in a government office, paid $3,000 in cash for the
document, and traveled from Boston to Miami to procure it. 
Moreover, the timing of this illegal purchase undermined a second
aspect of the petitioner's tale: he claimed that he had intended
a permanent return to El Salvador in 1990 but this claim does not
jibe with the significant investment he made in fraudulent
documentation just prior to his departure.
 These, and other, inconsistencies such as the
petitioner's admitted purchase of fraudulent documentation on an
earlier occasion, the factual variances between the petitioner's
second and third asylum applications, and his changing stories
about when he first entered the United States, see supra note 1 
coupled with the absence of plausible explanations for the
incongruities, amply justified the IJ's conclusion that the
petitioner's testimony lacked credibility.
 An asylum applicant must carry the devoir of persuasion
as to his eligibility. See 8 C.F.R. 208.13(a). To the extent
that the petitioner's testimony about what had occurred in the
1980-1985 time frame could be credited, the IJ supportably found
that it lacked the requisite degree of specificity to sustain the
petitioner's burden of proof. In particular, the vague evidence of
alleged persecution that the petitioner adduced failed to establish
a sufficient nexus between the events that he described and any
ground enumerated in 8 U.S.C. 1101(42)(A).
 On the petitioner's version, when the FMLN attempted to
recruit him in 1980, he never divulged his political leanings, and
the guerrillas expressed no awareness of them. Thus, the incident
is not significantly probative. See Elias-Zacarias, 502 U.S. at
482 (holding that "the mere existence of a generalized 'political'
motive underlying the guerillas' [actions] is inadequate" to
establish persecution on account of political opinion). This is
especially important because the record contains no evidence,
subsequent to the 1980 incident, of any harassment that is even
arguably linked to the petitioner's political views.
 The petitioner's father's participation in, and personal
support for, ARENA a political party in ideological opposition to
the FMLN does not trip the balance. While the IJ might have
drawn an inference that the FMLN targeted the petitioner because of
his membership in a social group (i.e., his family), she chose to
draw a contrary, equally plausible inference. Such choices are a
factfinder's prerogative. Where, as here the constellation of
facts and circumstances alleged by an asylum applicant, together
with the other record evidence, supports two or more competing
inferences, the IJ's choice among those inferences cannot be deemed
erroneous. Cf. 3-E Co. v. NLRB, 26 F.3d 1, 3 (1st Cir. 1994)
(explaining that a reviewing court will not disturb an ALJ's
credibility determination "so long as [it] represents a choice
between two fairly conflicting views"). A fortiori, the record
does not compel a conclusion that the guerrillas persecuted the
petitioner because of his family status.
 The petitioner next adverts to his service in the CDP
from 1982 to 1984. He suggests that this assignment marked him, in
the guerrillas' eyes, as a political adversary. By his own
testimony, however, the CDP's exclusive function was to protect
citizens from guerrilla attacks. Danger resulting from
participation in general civil strife, without more, does not
constitute persecution. See Martinez-Romero v. INS, 692 F.2d 595,
595-96 (9th Cir. 1982); Matter of Rodriguez-Majano, 19 I. & N. Dec.
811, 816 (BIA 1988). The petitioner introduced no evidence about
the motivation behind these attacks, and without some proof that
the guerrillas were attempting to harm or oppress the townspeople
on account of their political opinions, the record cannot
conceivably compel a conclusion that enlistment in the CDP
subjected its members to politically-inspired persecution. 
 Finally, the petitioner contends that the anonymous
threats that he received from time to time signaled his own
jeopardy, and that his peril escalated upon the slaying of his
older brother. Danger is one thing, but cause and effect is a
quite different concept. On the record as it stands, there is
nothing that forges an inexorable link between either the threats
or the murder and political opinion. As to the former, the IJ
plausibly suggested that, given the substantial land holdings of
the petitioner's family, such threats, if received at all, could
just as easily have represented attempts by the guerrillas to
garner financial support for their movement. As to the latter, the
decedent's role as commander of the CDP might well have aroused in
certain FMLN members a personal animosity that accounted for the
attack. In short, while the petitioner's (and his older brother's)
political opinions may have played a part in these untoward
incidents, the record does not mandate a finding to that effect.
 We need not add hues to a rainbow. The IJ viewed the
petitioner's evidence of past persecution through a prism of
warranted dubiety and found it inadequate. We cannot say that this
determination was clearly wrong or, put another way, that the
evidence compelled a finding that the petitioner had suffered past
persecution on account of his (or his family's) political views.
 2. Well-Founded Fear of Persecution. A second way in
which an alien may establish asylum eligibility is by demonstrating
a well-founded fear of future persecution. Even setting the
petitioner's damaged credibility to one side, his evidence on this
issue is insubstantial and contradicted by significant proof of
changed country conditions.
 The standard for proving a well-founded fear of future
persecution contains both subjective and objective components. SeeAlvarez-Flores v. INS, 909 F.2d 1, 5 (1st Cir. 1990). That is to
say, the asylum applicant's fear must be both genuine and
objectively reasonable. See id. Because we find it dispositive,
we focus primarily on the reasonableness prong.
 The degree of probability required to establish the
objective component of a well-founded fear of persecution is
somewhat less than the classic "more likely than not" formulation. 
See INS v. Cardoza-Fonseca, 480 U.S. 421, 450 (1987). Beyond a
tentative suggestion that a "reasonable possibility" of persecution
may capture the essence of the legal standard, id. at 440, the
Court has not been markedly more precise. The BIA and many courts
of appeals (including this court) narrow the relevant inquiry to
whether a reasonable person in the asylum applicant's circumstances
would fear persecution on account of a statutorily protected
ground. See Novoa-Umania v. INS, 896 F.2d 1, 2, 3 (1st Cir. 1990);
Carcamo-Flores v. INS, 805 F.2d 60, 68 (2d Cir. 1986); Guevara
Flores v. INS, 786 F.2d 1242, 1249 (5th Cir. 1986); Matter of
Mogharrabi, 19 I. & N. Dec. 439, 445 (BIA 1987). Viewed against
this backdrop, the IJ's determination that the petitioner failed to
show a well-founded fear of future persecution passes muster.
 Changed country conditions often speak volumes about the
objective reasonableness of an alien's fear that persecution lurks
should he return to his homeland. See, e.g., Kazlauskas v. INS, 46
F.3d 902, 906 (9th Cir. 1995). So it is here: the evidence
indicating that conditions in El Salvador have stabilized is highly
persuasive, and the BIA's conclusion that this proof outweighed the
petitioner's conclusory assertions of continuing danger is
therefore supported by substantial evidence.
 The record demonstrates unequivocally that El Salvador's
civil war ended over six years ago, when the United Nations (U.N.)
brokered the peace accords of 1992. The petitioner's self-
proclaimed nemesis, the FMLN, metamorphosed into a legitimate
political party at that time. State Department reports indicate
that, by 1995, the drumbeat of politically motivated murders had
become inaudible so much so that the Security Council withdrew
the U.N.'s observer mission. These developments reflect a direct
(and radical) change in the circumstances that the petitioner
alleges led him to bolt.
 In rebuttal, the petitioner offers more cry than wool. 
He points first to the vague threats that his family and friends
relayed to him during his 1990 return to El Salvador, and
speculates that members of the FMLN still sought to harm him at
that time. This is unabashed surmise. Equally as important,
because these events antedated the 1992 peace accords, their
relevance has been marginalized by the intervening changes.
 With respect to post-peace accords evidence, the
petitioner hawks six loosely related items: (i) conclusory
testimony elicited from his sister, a United States resident since
1988, to the effect that peril awaits him in El Salvador, and (ii)
a compendium of five letters sent to him by persons still living in
El Salvador. We have reviewed these materials and find them
inconsequential; neither the testimony nor the correspondence
contains specifics as to the nature of any danger, the identity of
any potential malefactors, or the reasons why people might wish to
harm the petitioner. Moreover, the sister's testimony is rank
hearsay (she, herself, has not been in El Salvador for over a
decade), and the source of the letter-writers' knowledge is
obscure. Unverified statements such as these are entitled to very
little weight in the asylum calculus.
 Two additional considerations drive home the frailties of
the petitioner's proof. First, the petitioner has another sister
and two other brothers who continue to live tranquilly in El
Salvador, and have done so throughout the duration of his
expatriation. The petitioner has not provided a satisfactory
differentiation of his situation from that of his siblings. 
Without some explanation, the fact that close relatives continue to
live peacefully in the alien's homeland undercuts the alien's claim
that persecution awaits his return. See Cuadras v. INS, 910 F.2d
567, 571 (9th Cir. 1990); Matter of A-E-M-, Int. Dec. 3338 (BIA
1998) (en banc). Second, the political party with which the
petitioner alleges affiliation, ARENA, convincingly prevailed in
the 1994 national elections and remains in control of the
government. Although action by non-governmental entities can
constitute persecution, see, e.g., Velarde v. INS, 140 F.3d 1305,
1311-13 (9th Cir. 1998), the law requires at least some showing
that the alleged persecutors are not subject to the government's
control, see Llana-Castellon v. INS, 16 F.3d 1093, 1097-98 (10th
Cir. 1994). In this instance, the record is barren of any
indication why a presumably friendly government would be unable to
protect a returning Aguilar from fringe renegades.
 To sum up, the IJ found that the petitioner's meager
basis for fear of future persecution failed to refute the
overwhelming record evidence of changed country conditions. 
Because substantial evidence supports this finding, it deserves our
approbation. In turn, this finding renders the petitioner
ineligible for a discretionary grant of political asylum.
 C. The Constitutional Challenge.
 The last matter to which we must attend concerns the
petitioner's newly minted challenge to the constitutionality of
NACARA. NACARA 202 permits certain deportable aliens from
Nicaragua and Cuba to apply for adjustment of status, and section
203 affords certain Guatemalans, Salvadorans, and Eastern Europeans
applying for suspension of deportation the benefit of the pre-
IIRIRA rules for calculating physical presence in the United
States. Congress explained that it was providing this
particularized relief to (i) classes of aliens who had taken
unusual risks in escaping from oppressive governments, and (ii)
those whose countries had been profoundly ravaged by war. See 143
Cong. Rec. S12261-62 (daily ed. Nov. 9, 1997) (statement of Sen.
Abraham).
 The petitioner conclusorily condemns the legislation on
four grounds: (1) that the Act violates the Equal Protection
Clause; (2) that it deprives persons of liberty without due
process; (3) that it abridges speech and assembly in contravention
of the First Amendment; and (4) that it contravenes the
Constitution's Ex Post Facto proscription. The petitioner fails to
develop these arguments. He likewise fails to connect the
legislation to his asylum application in even the most rudimentary
way or to indicate how he has standing to raise the claims that he
advances.
 This scattershot assault, wholly unsupported by coherent
argumentation, can be rejected out of hand. See United States v.
Bongiorno, 106 F.3d 1027, 1034 (1st Cir. 1997) (explaining that
this court has "steadfastly deemed waived issues raised on appeal
in a perfunctory manner, not accompanied by developed
argumentation"); Ryan v. Royal Ins. Co., 916 F.2d 731, 734 (1st
Cir. 1990) (similar). "It is not enough merely to mention a
possible argument in the most skeletal way, leaving the court to do
counsel's work." United States v. Zannino, 895 F.2d 1, 17 (1st
Cir. 1990). Consequently, we need go no further.

 The petition for review is denied and the BIA's order is
affirmed.