**Arsenio MARQUEZ and Victoria Marquez, Petitioners,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

**No. 96–1249.**

United States Court of Appeals, Seventh Circuit.

Argued Sept. 5, 1996.

Decided Jan. 28, 1997.

---

Y. Judd Azulay, Stephen D. Berman (argued), Azulay & Azulay, Chicago, IL, for petitioners.

Samuel Der-Yeghiayan, I.N.S., Chicago, IL, David M. McConnell, Stephen W. Funk, Marion E. Guyton, James A. Hunolt (argued), Department of Justice, Civil Div., Immigration Litigation, Karen Fletcher Torstenson, United States Department of Justice, Washington, DC, for respondent.

Before CUDAHY, MANION, and ROVNER, Circuit Judges.

CUDAHY, Circuit Judge.

Petitioners Arsenio and Victoria Marquez, husband and wife and citizens of the Philippines, left their home country in 1990 and entered the United States as visitors for pleasure. In response to the Immigration and Naturalization Service's (INS) 1993 attempt to deport them for staying longer than permitted, Mr. and Mrs. Marquez say that they qualify for political asylum or withholding of deportation. The INS says they do not. Petitioners have not undergone genuine persecution, the INS contends, nor do they have a well-founded fear of such; and even if petitioners had been persecuted or had a well-founded fear that they would be, they failed to draw the essential nexus between persecution and political opinion. The INS further argues that Mr. and Mrs. Marquez fall short of qualifying for withholding of deportation. An Immigration Judge and the Board of Immigration Appeals (BIA) agreed. We affirm.

## I. Procedural posture and statutory framework

On July 29, 1993, the Immigration and Naturalization Service charged petitioners with remaining in the United States longer than permitted under § 241(a)(1)(B) of the Immigration and Nationality Act (the Act), 95 Stat. 1616, as amended, and sought to have them deported. Mr. and Mrs. Marquez conceded their deportability but (1) applied for political asylum and (2) requested withholding of deportation. An Immigration Judge denied the request and issued a deportation order. Mr. and Mrs. Marquez appealed. The BIA affirmed in a final order dated

January 4, 1996. Petitioners filed timely for appeal before this court under § 106(a) of the Act, 8 U.S.C. § 1105a.

Petitioners must convince this court that the BIA decided either of the following two questions wrongly. The BIA said no to both; petitioners urge that the right answers are yes.

First, are Mr. and Mrs. Marquez eligible for political asylum? Because they are now on U.S. soil, the governing provision is § 208(a) of the Act, 8 U.S.C. § 1158(a). An alien "physically present in the United States ... may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee." *Id.* Whether Mr. and Mrs. Marquez might qualify for asylum therefore depends as a threshold issue on whether they are refugees. For this, we must look at the definition of refugee in 8 U.S.C. § 1101(a)(42)(A). The first part of the definition Mr. and Mrs. Marquez easily satisfy: they are "outside any country of such person's nationality," in this case outside the Philippines. As for most asylants, their case turns on the remaining portion of that definition. Mr. and Mrs. Marquez must be "unable or unwilling to return to ... that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.*

Second, are Mr. and Mrs. Marquez entitled to withholding of deportation? This ungainly phrase embodies a precept of international law: the principle of no forced return, or non-refoulement.[1] States must not forcibly send aliens to a country where their lives or freedom will be endangered, if that danger arises from a threat to a protected human right. Hence, "[t]he Attorney General shall not deport or return any alien ... to a country if [she] determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." § 243(h) of the Act, 8

---

1. Lung–Chu Chen, The United States Supreme Court and the Protection of Refugees, 67 ST. JOHN'S L.REV. 469, 471 (1993).

U.S.C. § 1253(h). Unlike the asylum provision, this provision bestows no discretion on the Attorney General. And unlike the asylum provision, withholding of deportation only restrains the Attorney General from deporting or returning the alien to a particular country. *INS v. Cardoza–Fonseca*, 480 U.S. 421, 429 n. 6, 107 S.Ct. 1207, 1212 n. 6, 94 L.Ed.2d 434 (1987). For Mr. and Mrs. Marquez, this country would be the Philippines.

For either question, the burden of proof falls on Mr. and Mrs. Marquez to prove that the answer is yes. 8 C.F.R. § 208.13(a) (asylum); § 208.16(b) (withholding of deportation). With this statutory framework in mind, we turn to the facts as the Immigration Judge and the BIA retell them.

## II. Mr. and Mrs. Marquez's story

Mr. and Mrs. Marquez owned and operated a good-sized commercial fishing boat in the Philippines with a crew of forty. When they bought the boat in 1981, they used it to secure their loan from the Rural Bank of Palompon. Along with quarterly repayments on the loan, the bank also expected a "representation fee," which it allegedly used to bribe its auditors. Mr. and Mrs. Marquez counted these payments against the debt owed. In 1986 they calculated that they had paid their debt in full, so they stopped sending the bank money. The bank kept a different set of ledger books, however. The bank's accounting, it seems, did not include these "representation fees." Claiming that Mr. and Mrs. Marquez had ceased payment on their debt, the bank had the sheriff repossess the boat. Mrs. Marquez asserts that the bank's president, Ms. Erlinda Chiong, ordered the repossession because she coveted the financially successful boat for herself. On this telling, Ms. Chiong suborned the local sheriff into seizing the boat illegally. The Marquezes brought a civil suit against the bank. Removed to Manila, the suit ended two years later in a judicial instruction for the litigants to settle the affair amicably. An amicable settlement meant a loss for Mr. and Mrs. Marquez. The bank kept the boat.

The boat story sets the scene for the real tensions between Mr. and Mrs. Marquez and the local powers-that-be. In 1986, Arsenio went on a radio talk show and denounced the seizure of his boat as well as the prevailing corruption in the Philippines. While on the radio, Arsenio fingered the Rural Bank, Ms. Chiong and a Lt. Col. Garcia as prime offenders. The radio station re-broadcast the interview several times and allegedly reached a wide audience.

Arsenio's radio appearance precipitated a spate of harassment. First, in December 1987, at least a year after the radio broadcasts, Lt. Col. Garcia disrupted a Christmas party at the Marquez home. With the help of a gang of militiamen-cum-thugs, Garcia intimidated Arsenio and his guests with guns. A soldier fired a shot into the ceiling. Arsenio testified that Garcia hit him with a pistol butt and then told the bleeding Arsenio that he had better stop voicing his opinion on the radio or he and his family would be harmed.

Arsenio then began a series of trips between the United States and the Philippines. He first came to the United States in May 1988, some five months after the Christmas affair. Because he missed Victoria and his children, Arsenio testified, he returned in February 1989 to the Philippines after eight months in the United States. This time he stayed in the Philippines only for two months, and allegedly remained in hiding with friends and relatives for the entire time. In April 1989 he came to the United States for the penultimate time, only to return once again to the Philippines in July 1989. This time he stayed there for a year, until he came to the United States permanently in July 1990. All told between May 1988 and July 1990, he made two round-trip journeys across the Pacific before settling finally in America. And of those twenty-six months, Arsenio spent eleven in the United States and fifteen in the Philippines.

Meanwhile, Victoria stayed behind in the Philippines, where she had her own alleged run-ins with Garcia and his minions. In 1988, Garcia came to her office at the Palompon Institute of Technology, where she worked as a management analyst. He accused her of holding "teach-ins" on communist ideology in her home. Stop, he warned her, or else she and her children would be

killed. Victoria asserts that she never held any such teach-ins. At another time, an intruder attempted to enter the house while she was alone with her children. Victoria scared the intruder off by firing a gun into the air. Later, someone uprooted her artesian well and left a note on her door stating that if she continued to report incidents of military abuses, she and her children would be killed. In November 1990, Victoria resigned her job, left her children with relatives and fled the Philippines for the United States.

### III. Petitioners' eligibility for asylum

To prove that they are "refugees" and thus eligible for asylum, Mr. and Mrs. Marquez must make two showings. First, they must demonstrate either actual past persecution or a well-founded fear of persecution in the future. Second, assuming that they can satisfy this first showing, petitioners must also show that the persecution they have endured is "on account of" one of the five protected statutory grounds.[2] Mr. and Mrs. Marquez invoke only the fifth and most common ground, political opinion.

■ Affirming the Immigration Judge, the BIA held that petitioners had failed on both counts. We review the BIA's factual determinations for a basis in "reasonable, substantial, and probative evidence," 8 U.S.C. § 1105a(a)(4), not unlike the test we employ in assessing federal district courts' factual findings. "To obtain judicial reversal," Mr. and Mrs. Marquez "must show that the evidence [they] presented was so compelling that no reasonable fact-finder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias*, 502 U.S. 478, 483–84, 112 S.Ct. 812, 817, 117 L.Ed.2d 38 (1992). As this circuit has stressed before, "[A] reviewing court is not entitled to reverse 'simply because it is convinced that it would have decided the case differently.'" *Anton v. INS*, 50 F.3d 469, 472 (7th Cir.1995) (quoting *Milosevic v. INS*, 18 F.3d 366, 371 (7th Cir. 1994)). We review the BIA's legal analysis

de novo, although we accord the BIA deference in construing the statutes it administers. *Draganova v. INS*, 82 F.3d 716, 720 (7th Cir.1996) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)).

Before reviewing the BIA's opinion, we pause to note our difficulties in understanding it. There are two main issues in this case: whether petitioners have been subject to persecution or have a well-founded fear of it in the future, and whether that persecution was or would be politically rooted. For the BIA, these are bread-and-butter issues, far from abstruse. The BIA should have approached them with clarity. Instead, the BIA lumped them together in a jumble. The key paragraphs veer between these issues from one sentence to the next, and then back again. This disorganization forces readers to track backwards several times in frustration until only a highlighter and extensive annotations in the margins can resolve the muddle. Readers—and this group includes not just judges but, more importantly, Mr. and Mrs. Marquez and their lawyer—should not have to dissect the decision to trace the twisted strands of the BIA's reasoning. The rule of law commands not just that decision-makers act rationally and impartially, but that they communicate their decisions clearly. An administrative agency like the BIA must "'announce its decision in terms sufficient to enable a reviewing court to perceive it has heard and thought and not merely reacted.'" *Guentchev v. INS*, 77 F.3d 1036, 1038 (7th Cir.1996) (citations omitted). Only if agencies fulfill this dictate of the rule of law can the governed know whether governmental arbiters have grounded their decision in reason and fairness. Here, by laying a coat of confusion on top of the Immigration Judge's more intelligible opinion, the BIA undermines our confidence in it.

---

**2.** The two-part formulation stems from the 1969 United Nations Protocol Relating to the Status of Refugees. Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967). The Protocol in turn draws on the 1951 United Nations Convention Relating to the Status of Refugees, which dealt more narrowly with displaced Europeans in the Second World War's aftermath. United Nations Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 137 (entered into force April 22, 1954). *See Chen, supra* note 1, at 471.

## A. Petitioners' alleged past persecution

To qualify as a refugee, a would-be asylant must show either past persecution or a well-founded fear of future persecution. 8 U.S.C. § 1101(a)(42)(A). At first blush, this two-fold formulation is puzzling. Asylum can only protect those who might undergo future persecution. Unlike a tort judgment, it cannot and does not aim to remedy the past; it is a prophylactic. So why probe the past as grounds for asylum? If the threat of future persecution subsides, so too would the rationale for granting asylum. A victim of anti-Islamic or anti-Christian oppression would not have a strong claim to asylum if the oppression was clearly over—say, if a tolerant regime put an end to it and the victim could return home safely. Why, then, does the statute direct us to look back, instead of just forward?

■ The answer is that the past serves as an evidentiary proxy for the future. The regulations state that if an applicant can show past persecution, this creates a presumption of a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1)(i). Yet, if the evidence shows that conditions in the home country have changed so dramatically as to undermine the well-foundedness of that fear, that presumption disappears, and the applicant cannot receive asylum. A caveat exists for this rule, and one consistent with the prospective aim of the statute. Even if the home country situation has changed, the applicant can receive asylum if she can show some "compelling reasons ... arising out of the severity of the past persecution" for not returning. 8 C.F.R. § 208.13(b)(1)(ii); see, e.g., Skalak v. INS, 944 F.2d 364, 365 (7th Cir.1991). In other words, the focus stays on the future: will a grant of sanctuary forestall future harm? See also Stankovic v. INS, 94 F.3d 1117, 1118–19 (7th Cir.1996).

■ Congress has left defining the word "persecution" to the courts. See Balazoski v. INS, 932 F.2d 638, 641–43 (7th Cir.1991) (Flaum, J.) (thoughtful discussion of asylum provisions and "persecution"). The Supreme Court has held that persecution is a "broader concept than threats to 'life or freedom,'" the phrase that triggers withholding of deportation. INS v. Stevic, 467 U.S. 407, 428 n. 22,

104 S.Ct. 2489, 2500 n. 22, 81 L.Ed.2d 321 (1984). In this circuit, we view persecution as encompassing not only death and imprisonment, Sharif v. INS, 87 F.3d 932, 935 (7th Cir.1996), but "the well-founded fear of non-lifethreatening violence and physical abuse." Balazoski, 932 F.2d at 642 (leaving open possibility of broader definition). Within these vague contours, neither our case law nor the BIA offers much guidance for sorting out asylum applicants. The prevailing approach is, perhaps unfortunately, largely ad hoc.

■ The burden on applicants to demonstrate past persecution is not an especially weighty (or well-defined) one. They need not offer conclusive proof of their assertions. INS v. Cardoza–Fonseca, 480 U.S. at 450, 107 S.Ct. at 1222–23. If Mr. and Mrs. Marquez can " 'present specific facts' " that give rise to an inference that " 'he or she has actually been the victim of persecution ... on account of ... political opinion,' " Draganova, 82 F.3d at 720 (quoting Carvajal–Munoz v. INS, 743 F.2d 562, 574 (7th Cir.1984)) (citations omitted), then these facts will suffice.

■ The BIA and Immigration Judge (IJ) held that Mr. and Mrs. Marquez had failed to make the requisite showing of past persecution. While the BIA and the IJ did not endorse the Marquezes' testimony, they did accept the couple's statements as true for purposes of their decisions—and concluded that the couple failed even so. The repossession of the boat and the loss of the resulting lawsuit the BIA and IJ rejected out of hand as inadequate for proving persecution. Severe economic deprivation could qualify as persecution in this circuit, Sharif v. INS, 87 F.3d at 935, but losing a large commercial craft in the courts does not.

■ Lt. Col. Garcia's putative bullying presents a trickier question. Mimicking the IJ, the BIA noted that he made only three threats, separated over a long period of time. As the IJ recounts it, Garcia menaced the Marquezes three times: at the Christmas party in 1987, at Victoria's office in 1988 and when the artesian well was wrecked (assum-

ing this was Garcia's doing). The long gaps between these incidents do tend to undermine an inference of persecution. So, too, does the fact that at least a year elapsed after the radio denunciations before Garcia disrupted the 1987 Christmas gathering.

These incidents suggest that Garcia is a bully. We do not doubt that Garcia's acts would be vexing and upsetting. But the incidents do not lead to the obvious inference that Garcia and his backers were persecuting Mr. and Mrs. Marquez within the meaning of 8 U.S.C. § 1101(a)(42)(A). The BIA and the IJ assert that Mr. and Mrs. Marquez were never harmed, which seems to overlook Mr. Marquez's claim that Garcia struck him with the pistol butt during the Christmas party. Even if we were to accept this claim as true, it would not force a contrary conclusion. We accordingly cannot overturn the BIA's determination.

**B. Petitioners' alleged well-founded fear of persecution**

Because the asylum laws assume that the past is often prologue to the future, petitioners' failure to show past persecution, without more, bodes poorly for their attempt to show a well-founded fear of persecution. Petitioner must make two showings: one, of their genuine subjective fears, and two, of the objective reasonableness of those fears.

■Although the IJ raised doubts about whether Mr. and Mrs. Marquez really feared persecution if repatriated, the BIA restricted itself to criticizing the objective reasonableness of their fears. We will follow the BIA. Arsenio took five months to flee the Philippines after the Christmas party. He then returned twice in the late 1980s and stayed in the Philippines for long periods of time without trouble (although he claims to have been in hiding). The acts of alleged persecution occurred over eight years ago. Mr. and Mrs. Marquez's family, including their children and Arsenio's brother, have lived in the Philippines without incident throughout this time. We also note that the BIA skipped over perhaps the most convincing argument in the IJ's decision. The IJ viewed skeptically petitioners' claim that, in an archipelago nation of 5000 islands, Ms. Chiong and Lt. Col.

Garcia would likely take the time and expense ten years after the radio broadcast to track down and retaliate against Mr. and Mrs. Marquez. Yet we review the BIA's decision, not the IJ's, and we do not consider what the BIA has omitted.

Based on these facts, the BIA denied that applicants' alleged fears are well-founded. The BIA's objections are rational and legitimate, and do call into question the objective reasonableness of Mr. and Mrs. Marquez's fears. We cannot disturb the BIA's findings.

**C. The essential nexus between persecution and political opinion**

Given that we have upheld the BIA's determination that Mr. and Mrs. Marquez have neither experienced past persecution nor have well-founded fears of future persecution, petitioners cannot prevail. In fact, even if we were to find the other way, we would still reject a second essential element that Mr. and Mrs. Marquez must show: that the persecution was or would be "on account of" political opinion.

■ Petitioners argue that the BIA erred as a matter of law by concluding that criticizing corrupt agents of the government does not qualify as a form of "political opinion." We find this claim off the mark. The BIA contends nowhere in its opinion that, as a matter of law, condemnation of military corruption is, in general, not a political opinion. Rather, the BIA concluded that, on the facts before it, political opinion was not the real reason for petitioners' alleged persecution. We treat the BIA's determination as one of fact and accord it due deference.

■ The BIA concluded that greed and jealousy, and not politics, fed the feud with Ms. Chiong and Lt. Col. Garcia. A personal dispute, no matter how nasty, cannot support an alien's claim of asylum. *See, e.g., Carvajal–Munoz v. INS*, 743 F.2d at 579. Without a firm footing in one of the five protected bases, asylum law offers no succor. We conclude that the BIA has not erred in viewing the Marquezes' difficulties with Chiong and Garcia as apolitical.

Whether the dispute was on account of political opinion is difficult to say. Arsenio spoke out against military corruption on a radio show. He and his family suffered violent reprisals as a result. That Garcia did not begin menacing them until after the radio show is consistent with either a personal or a political animus. When he did threaten the Marquez family, he warned Arsenio to stop speaking out. But that presents another mixed motive: was Garcia reacting to Arsenio's politics, trying to shut Arsenio up for purely self-protective reasons or a blend of both? We do not know.

The INS urges that generalized conditions of corruption in a country are very much like civil strife, which cannot justify asylum for all its victims. " '[C]onditions of political upheaval which affect the populace as a whole or in large part are generally insufficient to establish eligibility for asylum.' " *Gonzalez v. INS,* 77 F.3d 1015, 1021 (7th Cir.1996) (quoting *Sivaainkaran v. INS,* 972 F.2d 161, 165 (7th Cir.1992)). On the same rationale as for political upheaval, we understand that not every victim of corruption can qualify for political asylum. Several billion human beings might otherwise be eligible for asylum in the United States or any other state subscribing to the United Nations Protocol Relating to the Status of Refugees. *See supra* note 2.

So much we agree with, but the INS' point is only partly dispositive. Widespread corruption may not be a ground for asylum, but political agitation against state corruption might well be. The issue is why Garcia and his paymaster Chiong retaliated against Arsenio's public condemnation and his broader attack on the corrupt alliance of military and business. Suppose that Arsenio had founded an anticorruption political party, or assumed an active role in one. Or that he had spoken out repeatedly as a public gadfly about reforming a corruption-ridden government. Suppose further that governmental agents then burgled his house, roughed him up, threatened his wife at work, wrecked his drinking well, threw him in jail and harassed his children—all within a short span of time. We think that scenarios like these would give

us more confidence that Arsenio had been persecuted on account of political opinion.

The question before us is whether Arsenio's case is more like these scenarios or a purely apolitical feud between two hostile groups. Maybe Lt. Col. Garcia was so effective in scaring Arsenio and Victoria that Arsenio's political campaign against corruption never blossomed. Maybe not. We cannot tell. Where we cannot state with conviction what motivated Arsenio and his alleged persecutors, we must defer to the BIA's own findings.

On appeal to this court, petitioners seek to re-tie their alleged persecution to a new basis of political opinion: Garcia's and his comrades' false imputation of Communist sympathies to Mr. and Mrs. Marquez. Mr. and Mrs. Marquez did mention this ground for Garcia's acts in their testimony, such as when Garcia menaced Victoria and told her not to hold any more "teach-ins." Yet they did not stress the point before the BIA, and they do so only halfheartedly here. This was probably wise, for the overwhelming impression that petitioners' testimony gives is that this Communist-sympathizer theory is a red herring. As Victoria herself testified, the banker Ms. Chiong had put Garcia up to accusing Victoria of holding teach-ins. We are skeptical that anti-Communism and not revenge motivated Ms. Chiong. Neither the BIA nor the IJ addressed this theory, and we cannot say that the BIA and the IJ were wrong not to do so.

## IV. Withholding of deportation (non-refoulement)

In sketching the differences between the asylum and withholding provisions, we earlier noted that while the Attorney General may grant asylum to the eligible, she must withhold deportation from the entitled. The difference is not just that between a privilege and a right; there is an evidentiary distinction as well. An applicant for asylum need only demonstrate a well-founded fear of persecution. An applicant for withholding of deportation must meet a higher burden, that of demonstrating a clear probability of a threat to her freedom or life. *INS v. Stevic,* 467 U.S. at 413, 104 S.Ct. at 2492. We

interpret the distinction as barring anyone who fails the laxer asylum test from passing the more stringent deportation-withholding test. *Stankovic*, 94 F.3d at 1119; *see also Gonzalez*, 77 F.3d at 1023; *Balazoski v. INS*, 932 F.2d at 640. Because Mr. and Mrs. Marquez are not eligible for asylum, we also find that they are not entitled to withholding of deportation.

## V. Conclusion

If appellate judges are ill-positioned to overturn the factual findings of trial courts, we sit in at least as poor a position to evaluate happenings in countries far away and of which regrettably we know little. The result today is thus an unsurprising one.

AFFIRMED.