In the

# United States Court of Appeals
### For the Seventh Circuit

---

No. 04-2286

KASTRIOT MUSABELLIU, ASIJE MUSABELLIU,
and LEDINA MUSABELLIU,

*Petitioners*,

*v.*

ALBERTO R. GONZALES, Attorney General
of the United States,

*Respondent.*

---

Petition for Review of a Decision of the
Board of Immigration Appeals

---

ARGUED SEPTEMBER 27, 2005—DECIDED MARCH 27, 2006

---

Before CUDAHY, POSNER, and EASTERBROOK, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* For 30 years Kastriot Musabelliu served in Albania's military. When mustered out at the end of January 2001 he held the rank of brigadier general. He used a tourist visa to enter the United States that May; when the visa expired he neither departed nor sought an extension. He claimed asylum with only a few days left in the year allowed for that step. 8 U.S.C. §1158(a)(2)(B). His wife and daughter have filed claims that depend on his; we do not discuss them further.

Musabelliu contends that he was persecuted (and remains at risk of persecution) because of his political opinions. He

relates that during the first half of 1999, while Serbian forces were removing ethnic Albanians from Kosovo and soldiers under his command were posted at the border, he noticed illegal arms deliveries into Kosovo and the diversion of food from refugees to the black market. He notified both his immediate superior and Luan Hajdaraga, the Minister of Defense, who told him to keep his mouth shut and mind his own business—which he did, allowing both the arms smuggling and the diversion of relief supplies to continue. A colonel at the time, Musabelliu soon was promoted to general. Hajdaraga was removed from the defense portfolio on July 7, 2000, though in July 2003 he returned to the cabinet as Acting Minister of Foreign Affairs. (He is not in office today. His party lost the election in 2005, and a new cabinet was formed that September with Sali Berisha of the Democratic Party as Prime Minister.)

Musabelliu suspects that Hajdaraga (though out of office) had a hand in his dismissal (which the military services justified on the ground that 30 years is enough). Musabelliu likewise suspects that Hajdaraga was behind an incident during January 2001: two persons fired at a military convoy in which Musabelliu was riding. After the end of his military career Musabelliu tried without success to meet with Prime Minister Ilir Meta and asked the public prosecutor to do more about corruption; he was shot in the arm during April 2001 while returning from a visit to the prosecutor's office and maintains that all those who have opposed Hajdaraga must flee Albania if they are to remain safe.

The immigration judge concluded that Musabelliu had not established, by a preponderance of the evidence, that his speech caused the later events. The immigration judge added that, even if all of Musabelliu's suspicions are correct, they would not show that he had been or would be persecuted on account of his political opinions. The

Board of Immigration Appeals agreed with the immigration judge on both grounds.

Asylum is available to refugees, a term defined in 8 U.S.C. §1101(a)(42)(A) as those facing "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion" in their native land. Losing a job is not persecution. See *Medhin v. Ashcroft*, 350 F.3d 685, 689 (7th Cir. 2003). Musabelliu does not contend that other employment in Albania was closed to him or that he faced substantial economic disadvantage. See *Borca v. INS*, 77 F.3d 210, 215-17 (7th Cir. 1996); *Kovac v. INS*, 407 F.2d 102, 107 (9th Cir. 1969); *Matter of Acosta*, 19 I&N Dec. 211, 222 (BIA 1985). The spoils system is limited by the first amendment in the United States, see *Rutan v. Republican Party of Illinois*, 497 U.S. 62 (1990); *Elrod v. Burns*, 427 U.S. 347 (1976), but we do not ban all efforts to fill public positions with persons deemed reliable (let alone insist that the whole world follow *Rutan* and *Elrod*). Asylum is not a form of unemployment compensation. In this nation senior military officers are subject to Senate confirmation; no one doubts the ability of the President and Senate to deny a generalship to a person whose opinions they deem unacceptable. So although it may be regrettable when a foreign nation removes from its military command persons who have opposed corruption, that does not entitle the removed officer to live the rest of his life in the United States.

For completeness we add that Musabelliu has not established that his speech led to the discharge. *Post hoc ergo propter hoc* is not a good way to prove causation. Musabelliu was left in his post at the border after passing his observations up the chain of command. Later he was promoted. Thirty years is a long career for a military officer in the United States; if a return to civilian life after three decades is unusually soon for generals in Albania, then Musabelliu could have demonstrated that fact in order to support an

inference that his departure had an unusual cause. Substantial evidence supports the agency's conclusion that he has not established that his decision to inform his superiors cost him his military career. See *INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1 (1992). See also 8 U.S.C. §1252(b)(4).

The same must be said about the convoy incident in January 2001. Musabelliu testified that the shots were fired at the lead vehicle in a convoy. Musabelliu himself was farther back in the line and was uninjured. At the time, the region that Musabelliu's solders had been patrolling (and from which the convoy was departing) was full of armed refugees from Kosovo plus other armed factions and some bandits. That two people shot in a convoy's direction could have had many causes other than an effort to assassinate the commanding general; and if it *was* an effort to kill the general, it could have had causes other than Musabelliu's statements two years earlier. Musabelliu may have had many enemies; having served since 1971 in the military of one of the world's most repressive regimes (Enver Hoxha, who ruled Albania between 1944 and 1985, was intolerant of religion, markets, speech, and freedom, among other things, and his successor Ramiz Alia continued his policies through 1990) Musabelliu may have been at risk from other persons who wanted to settle scores once arms became available to the populace. The agency did not commit a clear error in concluding that Musabelliu had not established a causal link between his 1999 statements and this incident.

Unlike losing command of a brigade, a risk of death can be "persecution," so the next question is whether Musabelliu's post-discharge complaints to the public prosecutor, and his efforts to meet with the Prime Minister, are a form of "political opinion" that led to the shooting incident in April 2001. Musabelliu changed his story in material ways between his written application for asylum and the hearing. In one version the prosecutor

summoned *him* (the implication being that Musabelliu was in trouble with the authorities), and in another Musabelliu took the initiative in helping a crusading prosecutor get the goods on corrupt office holders. In one version Musabelliu was shot, from long range, a good distance from his home; in another he was shot from close range just outside his door. In one version the press had publicized his upcoming visit to the prosecutor (the implication being that someone who learned about his whistle-blowing wanted his mouth closed), and in another the visit was confidential. The immigration judge noted that no press accounts were introduced into evidence, though they should have been available—if only because Musabelliu had held a high position in a small nation (Albania's population is under 4 million), and his shooting would be newsworthy even though the wound was not life-threatening. His wife Asije testified that the incident "was everywhere in the media."

Musabelliu testified that he was a friend of the U.S. Ambassador, who believed that Musabelliu was at risk and issued visas so that his family could escape to safety; but the IJ concluded from the timing of the visa applications (which predated April 2001) that this cannot have been so. Joseph Limprecht, the Ambassador to Albania at the time of these events, could have cleared matters up, but died in May 2002 (the same month Musabelliu applied for asylum), which enabled Musabelliu to testify without fear of contradiction—and he did not offer either testimony or affidavit from anyone else who was on the Embassy's staff at the time and would have been able to confirm his version of events. That almost a year passed between Musabelliu's arrival in the United States and his claim for asylum, and that the stated reason for the visas was to allow Musabelliu and his wife to attend their daughter's graduation from college, further undermine his contention that the Embassy issued the visas to facili-

tate the family's escape. Finally, the IJ noted that even if everything Musabelliu said on the stand is true, there is no particular reason to believe that Hajdaraga (out of public office at the time) was behind the shooting. Musabelliu had been warned by friends to "watch his back," but they did not say why—and as we have noted he may have had many enemies. The IJ's evaluation is not an adverse credibility determination; instead it is a conclusion Musabelliu had not established the cause of the events to which he testified, and that decision cannot be labeled clearly erroneous.

All questions about causation to one side, Musabelliu still has problems, for he did not take a public political stand. Whistle-blowing about public corruption can be a form of political opinion. See *Marquez v. INS*, 105 F.3d 374, 381 (7th Cir. 1997); *Grava v. INS*, 205 F.3d 1177, 1181 (9th Cir. 2000). Someone who campaigns against the government and urges the voters to throw the rascals out is engaged in political speech. Likewise someone who writes an op-ed piece or otherwise urges the people to rid themselves of corrupt officials. But Musabelliu did not do either of these things. Instead he made his views known within the chain of command, as part of his official duties. Later he talked in private with a prosecutor. It is an open question even in the United States whether the first amendment gives public officials a right to be free of retaliation when they speak within an agency's hierarchy on an issue of public concern, as part of their duties. The Supreme Court has granted certiorari in *Garcetti v. Ceballos*, No. 04-473 (reargued Mar. 21, 2006), which presents a question along these lines.

Smuggling and the diversion of relief supplies are issues of public concern, but Musabelliu did not take them to the public in quest of a political decision. Cf. *Connick v. Myers*, 461 U.S. 138 (1983); *Givhan v. Western Line Consolidated School District*, 439 U.S. 410 (1979); *Taylor v. Carmouche*, 214 F.3d 788, 792 (7th Cir. 2000). It would be implausible to treat the reference to "political

opinion" in §1101(a)(42)(A) as necessarily encompassing forms of expression that may not have constitutional protection even in the United States—and that are, if protected at all, at or near the outer limit of the first amendment's coverage. The need for a public stance on politics, as opposed to crime (which everyone is against in the abstract), is a point we made in *Marquez*, which sustained the agency's order even though Marquez had broadcast his complaint about corruption over the radio and thereafter had been shot and pistol-whipped by a colonel. 105 F.3d at 377, 381. Musabelliu's case is easier.

How far to press the "political opinion" clause of the statute is a matter principally committed to the agency, whose understanding must be accepted unless it exceeds the interpretive leeway delegated by Congress. See *INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987). Unfortunately the Board of Immigration Appeals, while agreeing with the immigration judge that Musabelliu had not established persecution "on one of the statutorily protected grounds," did not spell out its reasoning or refer to any other opinion in which that subject had been explicated. We therefore cannot be sure that it meant to address the scope of "political opinion" in the statute or had some other rationale.

Although a conclusion that private communications to a military commander, a cabinet member, and a public prosecutor about potential crimes are not a form of "political opinion" could be an allowable understanding of the statute, this may not have been the Board's resolution. We therefore do not rely on this aspect of the Board's disposition; an agency must take a stance if it wants the court to rely on its exercise of interpretive discretion. The Board's conclusion that Musabelliu has not shown a causal connection between his speech and the later events is, however, wholly a matter of fact, and is supported by substantial evidence.

The petition for review is denied.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—3-27-06