In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-1097

SHKELQIM HAXHIU,

*Petitioner*,

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,

*Respondent.*

_____

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A97-638-589

_____

SUBMITTED JANUARY 30, 2008[Œ]—DECIDED MARCH 19, 2008

_____


Before FLAUM, MANION, and EVANS, *Circuit Judges*.

FLAUM, *Circuit Judge*.   Shkelqim Haxhiu, a native and
citizen of Albania, applied for asylum, withholding of
removal, and relief under the Convention against Torture
(CAT), alleging that he had been persecuted on account

_____

[Œ] On January 29, 2008, we granted the petitioner's motion to
waive oral argument. Therefore, the petition for review is
submitted on the briefs and the record. *See* Fed. R. App. P. 34(f).

of his political opposition to government corruption.[1]
The Immigration Judge denied the requested relief, and
the Board of Immigration Appeals summarily affirmed
the IJ's decision. Because substantial evidence does not
support the IJ's findings that Haxhiu's persecution was not
on account of his political opinion and that state actors
were not responsible for the harm alleged, we grant his
petition for review, vacate the order of removal, and
remand for further proceedings.

## Background

The facts of this case are undisputed because the IJ
credited Haxhiu's testimony in full. *See Hernandez-Baena
v. Gonzales*, 417 F.3d 720, 721 (7th Cir. 2005). Haxhiu is a
35-year veteran of the Albanian Army, where he at-
tained the rank of colonel. In February 1999 Haxhiu was
assigned to supervise military recruiting operations in
Tirana, Albania, a position that included among its
duties the eradication of widespread corruption. Haxhiu
notes that chief among his accomplishments was a re-
duction in the theft of payments to excuse military service.
According to Haxhiu, Albanian citizens can, by law, buy
their way out of compulsory military service at a cost of
approximately $2,500 to $3,000, and these payments,
often made in cash, were finding their way in to the
pockets of individual military and government officials.
Haxhiu implemented an accounting system that ensured

---

[1] His wife, Dudije Haxhiu, seeks relief derivatively through
Haxhiu, although she is not a party to this appeal. *See* 8 U.S.C.
§ 1158(b)(3)(A); *Bace v. Ashcroft*, 352 F.3d 1133, 1137 (7th Cir.
2004).

that each payment would be routed to a bank, thus preventing any further abuse, although angering the beneficiaries of the old system.

In another episode in his fight against corruption, Haxhiu protested the sale of a military building to private purchasers in 2000. Haxhiu testified that a group of corrupt Ministry of Defense officials conspired to reduce the sale price of the building from its true market value of approximately $1,000,000 to a mere $20,000 in exchange for remuneration in a later sale. These same individuals solicited Haxhiu's cooperation in their scheme—offering him an apartment as a bribe—but Haxhiu refused and exposed their efforts in a letter to the Defense Minister at that time. The building was never sold despite repeated attempts; whether Haxhiu's efforts made the difference is unclear, but his resistance did provoke immediate threats of termination from a director in the Ministry of Defense. Haxhiu also received phone calls from unknown individuals who threatened to kidnap his children unless he kept quiet about the sale of the building. These threats intensified after Ismail Lleshi, a particularly corrupt individual according to Haxhiu, became the Minister of Defense in 2000 and continued to push for the sale.[2]

Ultimately, Haxhiu was fired because of his efforts to resist government corruption. Although Haxhiu's job

---

[2] Haxhiu does not claim that *every* threat he received during this period came from a government actor, although some he can attribute to specific government officials. Instead, Haxhiu explains that the parties to the sale—corrupt officials on one side and private interests, which he labels an "economic mafia," on the other—were very much intertwined and even jointly responsible for orchestrating his treatment.

was admittedly to eliminate certain forms of corruption, his new superiors under Lleshi, themselves corrupt, were unhappy with his efforts. Upon termination in 2001, a group of Defense Ministry officials told Haxhiu, "This is just the beginning. We can do to you whatever we want because you are not in uniform now. You will see our power."

Unsurprisingly, Haxhiu's situation deteriorated further after he was fired. First, he challenged his termination in a letter to Albania's Supreme Court, although he did not file a formal complaint or enlist the help of an attorney, which perhaps explains why he did not receive a response. "[A]ggravated by this politician [Lleshi] and by this kind of politics," Haxhiu next approached a newspaper editor and a radio journalist with an offer to assist them in exposing corruption. But before anyone could publish or broadcast his accounts, Haxhiu withdrew his offer because of new threats against him and his family. For example, Haxhiu received word from Lleshi that if he talked to journalists, Haxhiu would end up "worse than [G]eneral Aqif Cikalleshi," a former military official who narrowly escaped an assassination attempt and had to flee to Italy after speaking to journalists on television.

Haxhiu responded to these threats by reiterating that Lleshi was a source of shame for Albanians and that Haxhiu was determined to expose various ongoing abuses to the press. Haxhiu reconsidered his position, though, after the threats turned to attacks on his family: On February 7, 2002, strangers beat his son badly and told him, "Tell your father to shut up his mouth or we will shut it for him for ever." And in May 2002 a group of men tried to kidnap Haxhiu's daughter. Fearing for the safety of his family, Haxhiu sent his son to England

and fled to the United States in August 2002, where his wife and daughter joined him one month later.

After three months in the United States, Haxhiu returned to Albania alone to see "if things had changed." But shortly after his return, Haxhiu was attacked while driving home with a friend from a nearby restaurant. Two gunmen cut off Haxhiu's car, got out of their vehicle, and began shooting at Haxhiu, shattering the windshield. Haxhiu and his friend were not hurt, though, and the gunmen ran away after firing all of their bullets. Still, the experience confirmed Haxhiu's fears about his homeland, and he decided to settle permanently in the United States in January 2003. Six months after re-entering the United States, Haxhiu sought asylum, withholding of removal, and CAT protection.

Following an immigration hearing in Chicago, Illinois, the IJ denied Haxhiu's applications. After determining that Haxhiu's testimony was credible and consistent with the record, the IJ turned to the more difficult question of whether the evidence demonstrated that Haxhiu had suffered persecution on account of a protected ground. The IJ began by noting that political agitation against state corruption can support an asylum claim, but to qualify Haxhiu needed to show that he took "active steps to fight [systemic] corruption in Albania" outside of his official duties. The IJ observed that Haxhiu's activities lacked a public aspect; his political activities were confined to the performance of his military function—his job, after all, was to stamp out corruption in the local office. Furthermore, the IJ determined that Haxhiu had not shown that the corruption of which he complained encompassed the government at large, as opposed to a few rogue individuals whose exposure could not be considered an expression

of political opinion. For these reasons, the IJ concluded that the harm suffered by Haxhiu was not on account of his political opinion. Even if there was a connection between his harm and his political opinion, the IJ continued, Haxhiu could not demonstrate that the Albanian government was responsible for his treatment, either directly or by failing to protect him.

On December 15, 2006, the BIA adopted and affirmed, without opinion, the IJ's decision, which became the agency's final determination.

## Discussion

Where the BIA summarily affirms the IJ's decision, as is the case here, this court will review the IJ's factual findings and analysis for substantial evidence. *Boci v. Gonzales*, 473 F.3d 762, 765-66 (7th Cir. 2007); *Mousa v. INS*, 223 F.3d 425, 428 (7th Cir. 2000). This deferential test requires us to uphold the BIA's denial of relief if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)). Reversal is appropriate only if the record *compels* a contrary result. *Id.* at 481 n.1.

The Attorney General has discretionary authority to grant asylum to aliens who meet the refugee requirements of 8 U.S.C. § 1101(a)(42)(A). 8 U.S.C. § 1158(b)(1)(A). That statute defines a refugee as one who is unable or unwilling to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). One way an applicant may demonstrate eligibility for asylum is by proving that he suffered past

persecution, which entitles him to a rebuttable presumption of a well-founded fear of future persecution. *Tesfu v. Ashcroft*, 322 F.3d 477, 481 (7th Cir. 2003). Haxhiu chose this method, so our analysis begins with an examination of his proof of past persecution.

The Attorney General does not dispute that Haxhiu has suffered persecution; rather, the first question in this case is whether Haxhiu suffered persecution *on account of his political opinion*. And since at least some of the harm alleged by Haxhiu was due to his fight against corruption, the main inquiry is whether Haxhiu's anticorruption activities constituted an expression of a political opinion. This court has defined a political opinion as "one that is expressed through political activities or through some sort of speech in the political arena." *Li v. Gonzales*, 416 F.3d 681, 685 (7th Cir. 2005). Although not every victim of corruption is eligible for political asylum, those who engage in "political agitation against state corruption," such as whistleblowers, can be persecuted on account of a political opinion. *Marquez v. INS*, 105 F.3d 374, 381 (7th Cir. 1997) (offering as examples of sufficient agitation founding an anticorruption political party; actively participating in an anticorruption party's activities; or speaking out repeatedly "as a public gadfly"); *see Musabelliu v. Gonzales*, 442 F.3d 991, 996 (7th Cir. 2006); *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (collecting cases that hold that opposition to government corruption can be a political opinion). To receive asylum protection on account of a political opinion, though, a whistleblower must have sought a political result by going outside of the scope of his official duties and the chain of command. *See Musabelliu*, 442 F.3d at 996 (explaining that a whistleblower must seek a political result by exposing corruption pub-

licly); *Pavlyk v. Gonzales*, 469 F.3d 1082, 1089 (7th Cir. 2006) (holding that conduct within the scope of one's governmental duties—such as a prosecutor expressing his view within the chain of command and pursuing an investigation—cannot alone constitute political expression). *But see Pavlyk*, 469 F.3d at 1091-93 (Cudahy, J., concurring) (noting that public political expression merely eases the burden of the applicant in showing that her persecution was on account of her political opinion; "[b]ut in some situations, an applicant's conduct of her public duties may carry an obvious political implication that invites persecution"); *Bace*, 352 F.3d at 1137-38 (holding that persecution of election commissioner for refusal to certify an election was on account of a political opinion).

Haxhiu's military duties are no obstacle to his asylum claim because his anticorruption activities persisted beyond his employment with the Albanian Army. *See Musabelliu*, 442 F.3d at 996; *Pavlyk*, 469 F.3d at 1089. He approached the press after his termination—and suffered persecution for doing so: the threats to his family, realized at least with respect to his son (the cause of his daughter's harm is unknown), came about because of his attempt to engage in "classic political activit[y]." *See Pavlyk*, 469 F.3d at 1089; *see also Musabelliu*, 442 F.3d at 995 (providing as an example of political speech that may attract persecution "someone who writes an op-ed piece or otherwise urges the people to rid themselves of corrupt officials"). Indeed, this round of threats specifically cited Haxhiu's public speech as the impetus for harm to him and his family. Thus, it was premature for the IJ to conclude his analysis at this stage. And it is not decisive that the corruption of which Haxhiu complained did not pervade every level of the Albanian government; a political opinion in op-

position to corruption carries no such requirement. *See generally Pavlyk*, 469 F.3d at 1089; *Musabelliu*, 442 F.3d at 995-96; *Marquez*, 105 F.3d at 381.

However, Haxhiu still must establish that the Albanian government was either complicit in his persecution or unwilling or unable to protect him from private parties who persecuted him. *See Garcia v. Gonzales*, 500 F.3d 615, 618 (7th Cir. 2007). As a preliminary matter, the Attorney General argues that Haxhiu has waived any argument on this point by failing to raise it in his brief before this court.[3] Federal Rule of Appellate Procedure 28 requires "an argument consisting of more than a generalized assertion of error, with citations to supporting authority." *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001); *see* FED R. APP. P. 28(a)(9)(A). This court must be able to "discern cogent arguments" in the brief, and the party must identify an "articulable basis for disturbing the . . . judgment." *Id.*; *see also Weinstein v. Schwartz*, 422 F.3d 476, 477 n.1 (7th Cir. 2005) (finding waiver where appellant treated argument in cursory fashion and failed to cite legal authority in both his briefs).

Petitioner's treatment of the government-responsibility issue is quite thin, and the decision not to file a reply brief on this point is puzzling, yet his opening brief contains a semblance of an argument that is supported by legal authority. Haxhiu emphasizes that the IJ found him credible; reiterates his testimony that the "economic mafia" and the government were at that time "married" and thus

---

[3] We note that Haxhiu raised this claim before the BIA and therefore exhausted his administrative remedies. *See* 8 U.S.C. § 1252(d)(1); *Margos v. Gonzales*, 443 F.3d 593, 599 (7th Cir. 2006).

indistinguishable; and concludes by comparing his case to another in which the alleged harm was perpetrated by government officials. Moreover, the two issues in this case—whether Haxhiu was targeted for combating government corruption and whether the government bears responsibility—overlap significantly, a point that Haxhiu makes in his brief. If the IJ believed Haxhiu's testimony that the government and the "economic mafia" were essentially one entity, it would follow that the government perpetrated, or at least permitted, the harm Haxhiu suffered. Haxhiu also refers this court to a Ninth Circuit opinion in which that court determined that opposition to government corruption is a political opinion for which an individual can be persecuted so long as the opposition is directed towards—*and the harm flows from*—a governing institution as opposed to aberrant individuals. *See Mamouzian v. Ashcroft*, 390 F.3d 1129, 1135 (9th Cir. 2004). Because we can identify an articulable basis for error in his brief, *see Anderson*, 241 F.3d at 545, we conclude that Haxhiu has not waived the argument that the Albanian government bore responsibility for his treatment.

Even if waiver were found in this case, such a conclusion would work a manifest injustice given Haxhiu's claim that he may be assassinated upon return to Albania, a claim that the IJ found credible. We may review issues not adequately briefed in this court if failure to do so would result in manifest injustice. *See McCarthy v. SEC*, 406 F.3d 179, 186 (2d Cir. 2005); *Mamouzian*, 390 F.3d at 1136 & n.4; *Natural Res. Def. Council, Inc. v. U.S. EPA*, 25 F.3d 1063, 1071 n.4 (D.C. Cir. 1994); *Grossart v. Dinaso*, 758 F.2d 1221, 1226 (7th Cir. 1985) (permitting an exception to waiver if injustice would result); *see also Commonwealth Edison Co. v. U.S. Nuclear Regulatory Comm'n*, 830 F.2d 610,

621 n.7 (7th Cir. 1987) (acknowledging the possibility of a manifest injustice exception). And the possibility of manifest injustice looms where deportation, already a "harsh measure," is "replete with danger [because] the alien makes a claim that he or she will be subject to death or persecution if forced to return to his or her home country*." INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987); *see also Mamouzian*, 390 F.3d at 1136 & n.4 (reviewing brief of alien seeking asylum with "lenity" due to credible claims of harm if alien was returned to home country). Given the severity of the harm alleged here, and the IJ's positive credibility determination, this appears to be a case where a manifest injustice exception to waiver would apply.

The waiver argument to one side, we consider whether the IJ erred in finding that Haxhiu did not demonstrate government complicity in his persecution. The IJ determined that Haxhiu attributed his treatment solely to the private "economic mafia" that stood to gain from the sale of his building. Accordingly, the IJ looked to whether Haxhiu ever filed a complaint with the police or government about the threats he received and the attacks his family suffered. Finding none—which is problematic because the record contains extensive documentation of a police investigation into the attempted kidnapping of Haxhiu's daughter—the IJ concluded that Haxhiu had failed to establish that the government was either unwilling or unable to protect him. But this analysis belies Haxhiu's testimony and the record, which provides ample evidence that agents of the Ministry of Defense persecuted him in tandem with private actors. Thus, Haxhiu was under no obligation to seek government protection from private actors, although he did report his daughter's attack. Because Haxhiu demonstrated gov-

ernment complicity in his persecution, the IJ erred in finding to the contrary. *See Garcia*, 500 F.3d at 618.

Finally, Haxhiu has waived judicial review on his remaining claims for withholding of removal and protection under the CAT by failing to address them in his brief before this court (other than to rehearse the legal standards for both) or in his brief before the BIA. *See Huang v. Gonzales*, 403 F.3d 945, 951 (7th Cir. 2005).

### Conclusion

For the foregoing reasons, we believe that substantial evidence does not support the IJ's decision. The record compels the conclusion that Haxhiu suffered past persecution and thus was entitled to a rebuttable presumption of a well-founded fear of future persecution. Accordingly, we GRANT the petition for review, VACATE the order of removal, and REMAND for further proceedings consistent with this opinion.