NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued April 21, 2009
Decided May 8, 2009

**Before**

WILLIAM J. BAUER, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 08-2888

| | |
|---|---|
| JAMILEH FAHMI DARWICH, et al., | Petition for Review of an Order of the |
| *Petitioners*, | Board of Immigration Appeals. |
| *v.* | Nos.   A096-493-530 |
| | A096-493-531 |
| ERIC H. HOLDER, JR., Attorney General | A096-498-532 |
| of the United States, | |
| *Respondent*. | |

**ORDER**

Jamileh Fahmi Darwich, an Assyrian Christian, came to America with her two children after Syrian officials allegedly confiscated her business and home, detained her for one day, and beat her.  She attributes these events to complaints she purportedly made to authorities about the illegal activities of her business partner, who, if he exists at all, may have ties to the Syrian government.  Darwich sought asylum, withholding of removal, and relief under the Convention Against Torture for herself and the children.  An IJ disbelieved her story and denied relief, and the BIA affirmed.  We deny the petition for review.

## Background

Darwich and the children entered the United States in February 2002 on visitor's visas. At the time the children were sixteen and eleven. Darwich's husband had come to America about eighteen months earlier; at the time they were purportedly separated, but they have since reconciled. Her husband received a labor certification and applied for adjustment of status, but his application was eventually denied. Darwich's visa expired in August 2002, but the Department of Homeland Security did not charge her with removability until April 2003, one month after she applied for the relief sought here.

In her asylum application Darwich claimed that she feared persecution in Syria because she is Christian, and because she had exposed her business partner's corruption. She explained that when she lived in Syria she owned and operated a plastics factory. Though initially the business did well, in June 2000 she began experiencing financial problems and chose to take on a partner, Ali Deebeh. She chose Deebeh because he was an Alawite and had connections with government officials. Alawites are a shi'ite Muslim sect who believe in the deification of Ali; though initially persecuted, Alawites are now the politically dominant sect in Syria. *See* Encyclopedia Britannica, *'Alwite*, *available at* http://www.britannica.com/EBchecked/topic/12399/Alawite (last visited Apr. 5, 2009).

According to Darwich, the partnership soured when she discovered that Deebeh had used her factory to store and process heroin. She confronted him and he responded by threatening her. Darwich went to the local authorities in December 2001 and filed a complaint against Deebeh with a high-ranking member of the Ba'ath party. She claims that security forces reacted by detaining and interrogating her overnight on December 24, 2001. After she was released, her factory was immediately confiscated for "economic crimes," and soon after her home was also confiscated. Deebeh threatened her with death if she continued trying to expose him; homeless and jobless she fled to America a month later. The record shows, however, that Darwich had applied for her visa months before her purported troubles with Deebeh began.

In June 2006, Darwich described the nature of her asylum claim at a removal hearing before an IJ. Generally, she claimed that Deebeh and the Syrian government persecuted her when she complained about Deebeh's corruption. She testified that Deebeh worked for the government and held a high rank in the Syrian military, although she did not know his exact rank. It was Deebeh, she said, who confiscated her factory and home on the authority of an order issued by a Syrian court. She added, though, that she had kept her husband in the dark about her problems with Deebeh because she feared that her husband would be killed or jailed if he became involved. The IJ continued the hearing so that Darwich could obtain evidence corroborating her claims, specifically documents pertaining to the confiscation of her property.

Before the hearing resumed, Darwich submitted many documents into evidence including several articles about isolated incidents of violence against Christians in Syria. She also submitted two reports from Amnesty International: in one, Amnesty reports that scores of people have been arrested in Syria because of their political beliefs; in the other, Amnesty details the risks of returning to Syria after having sought asylum, explaining that "the very fact of leaving the country to seek asylum abroad is imputed to be a manifestation of opposition to the Syrian Government." In addition to these articles, Darwich submitted a baptismal certificate verifying her birth date, her chamber-of-industry card describing her as a plastics worker, a registry of Syrians living abroad listing herself and her family, and a statement from a lawyer in Damascus, dated in December 2006, explaining that because of the "sensitivity of the matters" he could not assist Darwich with an "economic" accusation "brought against her." But despite the IJ's basis for granting the continuance, she did not submit any document corroborating her story or the purported seizures of her home and factory.

The government supplemented the record with the 2006 International Religious Freedom Report, a CIA World Factbook report on Syria, and the 2005 Country Reports on Human Rights Practices in Syria. The Religious Freedom Report describes the relationship among the religious groups in Syria as "generally amicable" with isolated incidents of tension. The report acknowledges that "status as an Alawite Muslim can be a factor in obtaining employment" with the government. At the same time, however, the report notes that in recent times most religiously motivated violence has been directed against Muslims, not Christians. The country report verifies that corruption among security forces is a serious problem but explains that most arrests and detentions involve individuals suspected of ties to radical Islam.

When the hearing resumed in August 2007, Darwich elaborated on the circumstances that caused her to flee Syria. First, she clarified the nature of her business. She explained that few women in Syria own businesses and that before operating her plastics factory she had run a fashion business. Darwich further testified that Deebeh's motivations for using her factory to deal heroin were two-fold: financial gain and a desire to take advantage of Darwich because she is Christian. Later in the hearing, however, she attributed her troubles with Deebeh to his desire to "get all the gains for himself" and push her out of the business. She testified that the authorities who received her complaint about Deebeh's corruption had called him and told him about the allegations instead of investigating. In response Deebeh spread rumors about her having extramarital affairs, which tarnished her Christian reputation and caused her husband to temporarily leave her. Her husband, though present at the removal hearing, did not testify.

It was at this August 2007 hearing that Darwich first mentioned being beaten by security forces during her one-night detention on December 24, 2001, though later in the same hearing she spoke again of her detention without mentioning physical abuse. She explained that, although Deebeh had personally confiscated her home and factory, he must have done so with the support of the government "because he's a member of the government and of the

intelligence." She conceded, however, that after her home was seized she and her children stayed with her mother and other relatives for approximately a month without incident before coming to America.

On cross-examination, Darwich testified that friends in the business community had advised her to take on Deebeh as a partner so that he could use his government connections to help her with licensing and customs matters. This time when asked about Deebeh's role in the government, she testified that he did not personally hold any government office but had family connections in the government. Darwich clarified that, before taking on Deebeh as a partner, she had not experienced any problems with the Syrian government while running her fashion business. But she claimed that because of Deebeh, it would now be impossible for her to conduct any business in Syria.

The IJ denied all relief. First, the IJ discredited Darwich's entire testimony, which doomed her case. The IJ noted that Darwich had given inconsistent accounts when testifying on different days; she had altered her story about Deebeh's purported connection to the Syrian government, the nature of her complaints against him, the confiscation of her business, and the alleged beating. In the alternative, the IJ reasoned that none of the harms described by Darwich would qualify as persecution even if her testimony was truthful and, regardless, she had not alleged persecution "on account of" a protected ground. As the IJ saw things, Darwich had recruited a corrupt partner into her business and complained when he cheated her, nothing more. Finally, the IJ concluded that Darwich, lacking a legitimate claim of past persecution, had also failed to establish a well-founded fear of future persecution. The IJ noted that Darwich had not presented any evidence that the Syrian government or Deebeh intended to harm her. The BIA adopted and affirmed the IJ's opinion.

## Discussion

In her petition for review Darwich argues that (1) the IJ's adverse credibility determination is not supported by substantial evidence, (2) the confiscation of her property and Deebeh's threats combined to establish past persecution, and (3) the harms she suffered were on account of a protected ground. Where, as here, the BIA adopts and affirms IJ's decision, we review the IJ's decision. *See Irasoc v. Mukasey*, 522 F.3d 727, 729 (7th Cir. 2008). And we will uphold the IJ's decision so long as it is supported by substantial evidence. *See Kadia v. Holder*, 557 F.3d 464, 467 (7th Cir. 2009). To qualify for asylum, a discretionary remedy, the applicant must establish a well-founded fear of persecution, *see* 8 U.S.C. § 1101(a)(42), *Xiao v. Mukasey*, 547 F.3d 712, 716 (7th Cir. 2008), and to benefit from withholding of removal, a mandatory remedy, she must show that there is a clear probability of persecution if she returns to her home country, *see Ingmantoro v. Mukasey*, 550 F.3d 646, 652 (7th Cir. 2008). To obtain either remedy the applicant must show that she fears persecution *on account of* her race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. §§ 1101(a)(42), 1231(b)(3)(A); 8 C.F.R.

§§ 1208.13(b), 1208.16(b)(2); *Torres v. Mukasey*, 551 F.3d 616, 625 (7th Cir. 2008); *Musollari v. Mukasey*, 545 F.3d 505, 508 n.2 (7th Cir. 2008).

Darwich first argues that the IJ improperly discredited her testimony, explaining that her testimony was consistent and, furthermore, that any purported inconsistencies were not material to her claim of persecution. We review credibility determinations deferentially and will uphold them unless the record compels a different conclusion. *See Tarraf v. Gonzales*, 495 F.3d 525, 532 (7th Cir. 2007).[1]

The IJ identified several inconsistencies between Darwich's application and her testimony, and within her testimony, that led him to discredit her story. Most prominent was the omission from her asylum application and initial testimony of any mention of the alleged beating during her overnight detention. Nowhere in the affidavit submitted with her asylum application, or in her testimony at the June 2006 hearing, does she claim that she was beaten. This omission is significant and was a proper basis for discrediting her testimony: the purported overnight detention was Darwich's only significant encounter with Syrian officials, it was the beating that supposedly prompted her to flee Syria, and she never explained why such a significant piece of information would have gone unmentioned for more than *four years*. *See Torres*, 551 F.3d at 632-33 (recognizing that petitioner's failure to mention in asylum application the severe mistreatment which allegedly prompted him to flee his country was a permissible basis for IJ to find his testimony not credible); *Shmyhelskyy v. Gonzales*, 477 F.3d 474, 480-81 (7th Cir. 2007) (recognizing that petitioner's unexplained failure to mention brutal beating in asylum application was a valid basis for discrediting his testimony); *Korniejew v. Ashcroft*, 371 F.3d 377, 384-85 (7th Cir. 2004) (same); *compare Georgis v. Ashcroft*, 328 F.3d 962, 969-70 (7th Cir. 2003) (overturning IJ's adverse credibility decision where petitioner offered reasonable explanation for failure to mention detention in asylum application). And perhaps most telling is the fact that Darwich goes to great lengths in her brief to explain other inconsistencies noted by the IJ but says nothing about this hole in her story.

The IJ also found it significant that Darwich told conflicting stories regarding Deebeh's role, or lack thereof, in the government: she variously described him as a military official, government employee, member of the intelligence apparatus, and as a private citizen with no official government role. In her brief in this court, Darwich tries to minimize the varied descriptions by saying that Deebeh could have been both a member of the ruling Ba'ath party and a member of the ruling dominant Alawite sect. But this is no answer at all to her vague and conflicting descriptions of Deebeh's connection to the Syrian government. *See Aung v.*

---

[1] Because Darwich applied for asylum in 2003, her case is not affected by the revised credibility standards of the REAL ID Act of 2005, which went into effect on May 11, 2005. *See* 8 U.S.C. § 1158(b)(1)(B)(iii); *Diallo v. Gonzales*, 439 F.3d 764, 766 n.1 (7th Cir. 2006).

*Gonzales*, 495 F.3d 742, 744-46 (7th Cir. 2007) (upholding adverse credibility finding based on IJ's opinion that alien's testimony regarding significant events was vague and confusing).

The IJ also discredited Darwich's story because she was unable to offer *any* relevant corroborating evidence related to the confiscation of her home and business; this too was a legitimate reason for the IJ to base his adverse credibility finding upon. *See Ikama-Obambi v. Gonzales*, 470 F.3d 720, 725 (7th Cir. 2006) ("[A]n IJ may disbelieve an applicant because she fails to provide corroborating evidence, and subsequently deny her claim."). All the evidence Darwich submitted was irrelevant to the confiscation of her property and her troubles with Deebeh; thus, it was inadequate to explain her inconsistencies or bolster her alleged fears in returning to Syria. *See Song Wang v. Keisler*, 505 F.3d 615, 622 (7th Cir. 2007) (explaining that corroborating evidence was inadequate to render alien's story credible where it did not explain inconsistencies in that story); *Aung*, 495 F.3d at 746 (explaining that corroborating evidence was inadequate where it did not support alleged persecution). Darwich tries to justify her lack of corroborating evidence by referencing the country conditions in Syria and noting that "it should be clear that asylum seekers and those assisting them must be careful not to transmit information that can be used against them." But this explanation falls short. There is no evidence whatsoever that her Syrian family members faced danger if they sent affidavits to America, nor does this explain why, at the very least, her husband could not have testified as to the events that caused him to leave his wife and home to come to America. Surely her husband would know if his residence in Syria had been seized, and surely he would know whether his wife had run a factory and, if so, with whom.

Darwich also attempts to undermine other "slight inconsistencies" that the IJ identified. But importantly, while the IJ did identify the inconsistencies that Darwich takes issue with, he did so only when recounting her story but did not rely on these less-significant inconsistencies in reaching his adverse-credibility determination. Because the IJ identified specific and material reasons for disbelieving Darwich's testimony, substantial evidence supports his adverse-credibility determination. *See Adekpe v. Gonzales*, 480 F.3d 525, 530 (7th Cir. 2007). That testimony is the substance of Darwich's claims for relief, and without it she could not prevail.

That is enough to decide this case, but, regardless, the IJ also was correct to conclude that Darwich suffered no harm on account of a protected ground. Darwich makes multiple references to the fact that she is Christian, but she never alleged that Deebeh or the Syrian government harmed her because she is Christian. Rather, she testified that the threats against her, her detention, and the confiscation of her property all resulted from her attempt to expose Deebeh's corruption. She now argues that, by exposing Deebeh, she acted as a whistleblower exposing governmental corruption.

This court and others have held that aliens who seek to expose political corruption, such as whistleblowers, may qualify as individuals persecuted on account of their political belief.

*Haxhiu v. Mukasey*, 519 F.3d 685, 690 (7th Cir. 2008); *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (collecting cases). But to qualify for relief, a whistleblower must seek a political result by publicly exposing corruption. *Haxhiu*, 519 F.3d at 690; *Musabelliu v. Gonzales*, 442 F.3d 991, 995-96 (7th Cir. 2006); *Marquez v. INS*, 105 F.3d 374, 381 (7th Cir. 1997). Here, Darwich never sought to publicly expose Deebeh's corruption. In fact, she initially sought to benefit from his governmental connections. Her only act "against" corruption was to alert authorities that Deebeh, a citizen with possible connections to the government, was stealing from her or perhaps using her business as a front for criminal activities. Simply alerting police of suspected crime is a far cry from forming an anti-corruption party or speaking out as a public gadfly against political corruption. *See Marquez*, 105 F.3d at 381.

Given that substantial evidence supports the IJ's decision to discredit Darwich's story, it would be nothing more than a hypothetical exercise to address whether the harms she suffered amount to persecution. What's more, because Darwich's alleged injuries, even if true, were not motivated by any animus towards a protected ground, it is unnecessary to address her persecution argument. Thus, the our inquiry can end here. Accordingly, we DENY the petition for review.